Docket No. 81441–Agenda 3–May 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. 

 DEDRICK COLEMAN, Appellant.

Opinion filed October 1, 1998.

CHIEF JUSTICE FREEMAN delivered the opinion of the court:

Following a trial in the circuit court of Cook County, a jury convicted defendant, Dedrick Coleman, of two counts of first degree murder, armed robbery, and home invasion. Defendant waived his right to a jury for the ensuing capital sentence hearing, and the circuit court sentenced him to death on the murder convictions. The circuit court also sentenced defendant to concurrent terms of 30 years for each of the home invasion convictions and concurrent terms of 30 and 60 years for the armed robbery convictions. The sentences for the armed robbery convictions were to be served consecutively to the terms for home invasion. On direct appeal, this court affirmed defendant's convictions and sentences. 
People v. Coleman
, 158 Ill. 2d 319 (1994). The United States Supreme Court subsequently denied defendant's petition for writ of 
certiorari
. 
Coleman v. Illinois
, 513 U.S. 881, 130 L. Ed. 2d 143, 115 S. Ct. 215 (1994).

Defendant thereafter filed a petition, which was later amended with leave of court, for relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122–1 
et seq.
 (West 1994)). The circuit court dismissed the amended petition without an evidentiary hearing, and this appeal followed. 134 Ill. 2d R. 651. We now affirm in part and reverse in part the order of the circuit court and remand the cause for an evidentiary hearing.

BACKGROUND

This court previously detailed the evidence adduced at defendant's trial in our opinion on direct appeal. See 
People v. Coleman
, 158 Ill. 2d 319. Accordingly, we will reiterate here only those facts which are germane to the issues raised in this appeal. Defendant's convictions stemmed from the double murders of Lance Hale and Avis Welch, which occurred in the first-floor apartment of a two-flat home in Chicago on April 26, 1989. The first-floor apartment was a known “drug house” owned and operated by Alex McCullough. Defendant knew McCullough through his employment in McCullough's drug operation. McCullough was also the boyfriend of defendant's sister. About one month before the murders, defendant and McCullough had argued about defendant's alleged theft of cocaine and $2,000.

At trial, Aldene Lockett, who lived in the second-floor apartment of the two-flat, testified that at around 5:30 a.m. on April 26, 1989, she heard voices coming from the first-floor apartment. A short while later, she heard a gunshot and something fall. Two more shots later rang out, and Lockett heard a door open. At this time, she looked out her window and saw a dark-

complected young man between 5 feet 6 inches and 5 feet 8 inches leave the apartment. The man was wearing all black clothing and sunglasses. Lockett later related what she had seen to police officers investigating the Hale/Welch murders.

Eventually, police connected defendant to the drug house murders, in large part due to defendant's shooting of McCullough five days later on May 1, 1989. Several people were present at the time of the McCullough shooting, and defendant told them that he wanted it said that he shot McCullough in self-defense. Nevertheless, some of these witnesses later turned themselves in to the police and informed them of defendant's true role in McCullough's shooting, as well as his involvement in the double homicide at the drug house. As a result, defendant participated in a lineup which was viewed by Aldene Lockett on May 2, 1989. At trial, Lockett testified that one of the lineup participants “looked like he fit the height and description” of the man she had seen leave the drug house. Lockett further told police that the man had been wearing sunglasses. The police then asked each of the lineup participants to put on sunglasses. All but one of the participants complied. According to Lockett, the participant who did not put on the sunglasses was the same participant who had the weight and height of the man she had seen leave the drug house. On cross-examination, Lockett stated that she did not positively identify anyone to police from the lineup, but merely told the police that the man who did not put on the glasses “could have been” the same man she had seen leave the murder scene because “he had the same height, and build, and color.”

Chicago police Detective Tony Maslanka testified that he and his partner, Detective Carroll, conducted the lineup which Lockett viewed. According to Maslanka, Lockett told him that one of the men in the lineup, identified by Maslanka as defendant, “looked like the individual she saw leave the first-floor apartment *** in regard to height, complexion, and physical build.” Maslanka stated that because Lockett had seen the suspect leave the building wearing sunglasses, each of the lineup participants was asked to put on a pair of sunglasses. All of the participants in the lineup complied, with the exception of defendant. Lockett again stated to Maslanka that the man who did not put on the sunglasses “was the individual whom she saw that day in question with regard to height, physical build, and complection [
sic
].” On cross-

examination, Maslanka admitted that Lockett did not positively identify defendant as the man she had seen leave the scene of the murders. Rather, Maslanka characterized her identification as “tentative” because Lockett had told him that she had not been wearing her glasses when she saw the suspect leave the building and that she was nearsighted.

The only other aspect of defendant's original trial which is at issue in this post-conviction proceeding is defendant's sentencing hearing. As noted previously, defendant waived his right to a jury at the capital sentence hearing. At the eligibility phase of the hearing, the circuit court found that defendant was over 18 years of age at the time of the murders and that the murders were committed during the course of an armed robbery. Accordingly, the court found defendant eligible for the death penalty. The court then commenced the aggravation/mitigation phase of the hearing. In aggravation, the State stressed the facts of the double murders and also adduced evidence concerning defendant's prior criminal record and disciplinary record while incarcerated. At the close of the State's case in aggravation, the circuit court granted defense counsel's request for additional time to gather evidence in mitigation. The circuit court also ordered that a presentencing investigation (PSI) report be prepared on defendant. However, the court was informed, at the next hearing, that the PSI report had not been prepared because defendant refused to be interviewed.

After several more continuances, the proceedings reconvened. The circuit court first denied defendant's previously filed motion for a new trial, but granted defendant's motion for allocution during the sentence hearing. The transcript of proceedings then reveals the following colloquy between the court, defense counsel, and defendant:

“THE COURT: *** Does defense have any evidence to submit in mitigation?

MR. PANARESE [defense counsel]: No evidence. I would like to make a record of some of the people that I did talk to, your Honor, some of Dedrick Coleman's family: specifically Laurence Coleman,
(footnote: 1) Erica Coleman who are sisters and Bernice Coleman and Fred Coleman who are the mother and father of Dedrick Coleman, Leaetta McGee, Lorrine McGee, Carl and Jerry McGee who are relatives on his mother's side.

Your Honor, I had spoke with them all and they conveyed to me that it was through conversation with the defendant that defendant did not want them to testify in that matter. They were unwilling to testify and they are not here obviously your Honor, and so we do not have any witnesses to speak on behalf of the defendant at this time.

THE COURT: Mr. Coleman, Mr. Panarese had discussed the fact that those people–he spoke to these people and they did not wish to testify at this hearing.

DEFENDANT: Yes, I told them not to.

THE COURT: Do you have anybody that you wish to call to testify before the Court in this hearing?

DEFENDANT: Yes, I do, but I don't want them here. I just–you know.

THE COURT: Well, you have to tell me if you have anybody you wish to call?

DEFENDANT: I don't have nobody I wish to call.

THE COURT: Pardon me.

DEFENDANT: No, sir. I don't have nobody I wish to call.

THE COURT: You understand we will issue subpoenas if you wish?

MR. PANARESE: Could I have one minute, Judge.

THE COURT: Yes.”

After a short recess, defense counsel informed the court that defendant did not “wish any subpoenas to be issued.”

The court next asked counsel to present their arguments in aggravation and mitigation. After hearing both arguments, the court allowed defendant to address the court in allocution. In his statement, defendant told the court that he did not commit the murders and that his sister, Laurarence, testified against him because “Mr. Hynes [the assistant State's Attorney] threatened to take her kids as well as lock her up. *** Now my little sister as well as the rest of them is willing to stand up in open court and tell what was really going on because this case is not mine.” At the conclusion of these remarks, the court allowed defense counsel another opportunity to confer with defendant before any sentence was imposed. The following colloquy then occurred:

“MR. PANARESE: Judge, in light of the statement, we are asking the Court to grant a continuance in this case for defendant to reopen mitigation phase of the hearing and also the possibility to file an amended motion for new trial. I would ask for a continuance to talk to the people he spoke about.

THE COURT: Who is that for the record.

MR. PANARESE: Specifically, Laurarence Coleman, Sophia Coleman and the mother of the defendant, Bernice Coleman and I will serve them with subpoenas, Judge and get them into court.

THE COURT: Mr. Coleman, I previously asked you when during mitigation hearing if you wish any witnesses called to testify on your behalf. Mr. Panarese at that time had read off a list witnesses [
sic
] I believe which included these particular persons, is that correct, Mr. Panarese.

MR. PANARESE: Yes.

THE COURT: And I asked you Mr. Coleman if you wish any of those persons called or if you wish any other persons called to testify during mitigation hearing and you at that time indicated that you did not want them called, is that correct?

DEFENDANT: Yes, sir, your Honor, but I misinterpreted on how mitigation – I thought you would just speak as far as if I wanted anybody to come in and you know –

THE COURT: Well, you have had a misunderstanding then with regards to that?

DEFENDANT: Yes.

THE COURT: You were asked that question and you indicated you did not wish any of them to testify?

DEFENDANT: I did say that.

THE COURT: Now is it my understanding from the motion of Mr. Panarese that he has asked that mitigation hearing be reopened so you may call these witnesses?

DEFENDANT: Yes, sir, your Honor.”

The court granted the motion and continued the cause for one week so that the mitigating witnesses could be secured.

When court reconvened, defendant called Laurarence and Sophia Coleman as mitigation witnesses. Both women denied that anyone had threatened to take away Laurarence's children in order to pressure her to testify against defendant. Defendant also presented the stipulated testimony of two cousins, Edward and Laura Davis, both of whom would have testified that Sophia told defendant that she did not know of any threats by the State's Attorney's office against Laurarence in order to compel her testimony at trial. The defense then rested in mitigation.

After taking note of the aggravating evidence, the circuit court individually listed the mitigating factors listed in the death penalty statute. With respect to the first mitigating factor, 
i.e.
, the lack of a significant prior criminal activity, the court specifically found that the factor was not met in this case, due to defendant's three prior felony convictions. The court further found that the murders were not committed while defendant was under the influence of extreme mental or emotional disturbance, the second listed factor in mitigation. The court then ruled that the third, fourth, and fifth factors in mitigation were not applicable to the case in view of the circumstances surrounding the double homicide. Moreover, based on the evidence of defendant's disciplinary record while previously incarcerated, the court concluded that defendant could not be rehabilitated or restored to useful citizenship, the sixth factor listed in the statute. Finally, the court noted that the statute provides that any other evidence in mitigation which was supported by the evidence could be considered in deciding whether defendant should not be sentenced to death. See Ill. Rev. Stat. 1987, ch. 38, par. 9–1. The court stated that it “can find no reasons why–or no mitigating factors applicable to this defendant based upon this record that would prevent him from receiving the death penalty.” The circuit court therefore sentenced defendant to death.

As noted earlier, this court affirmed defendant's convictions and sentences on direct appeal. Defendant subsequently filed an amended post-conviction petition, which alleged that several constitutional errors occurred during defendant's trial and sentencing hearing. Attached to the petition were numerous affidavits, a psychological evaluation, and a social history investigation prepared by a mitigation specialist. We will only discuss those claims that are raised by defendant in this appeal.

Defendant's petition initially alleged that the State violated defendant's right to due process and a fair trial by concealing material evidence which was favorable to the defense and by using perjured testimony to obtain the convictions. In support of this claim, defendant attached to his petition the affidavit of Aldene Lockett. In the affidavit, Lockett states that she saw the gunman's face as he was leaving the first-floor apartment and that she remembers “recognizing it from the neighborhood.” According to the affidavit, while at the lineup, Lockett “felt that the police were trying to get me to single out the male who refused to put on the shades, because they went back to him in the lineup and told me that this was the guy we picked up for the murders. I told them that this guy was not dark enough to be the guy who had come out of the downstairs apartment.” Lockett also states in her affidavit that she does not “remember seeing the guy who refused to wear the shades during the police lineup in the neighborhood before” and that she remembers “telling the States Attorney, Michael Kelly, about how this guy in the lineup didn't look like the guy I saw come out of the downstairs apartment, but [Kelly] would always say something to try and convince me that he was the right guy.” Finally, Lockett states that Assistant State's Attorney Kelly and his investigators “would call her every two or three days to go over [her] story to make sure it didn't change.” In exchange for her testimony, the investigators promised to move her to her home state of Alabama or to find her a new place to live in Chicago. After one year had passed and Lockett was ready to move, she called the State's Attorney's office, but was told that Kelly no longer worked there. Lockett further states that no one from the defense team ever contacted her. Defendant's amended petition also alleged ineffective assistance of counsel based on this affidavit in addition to counsel's failure to interview certain witnesses to the Alex McCullough shooting. Finally, defendant's petition alleged that defendant was denied effective assistance of counsel during his sentence hearing because counsel failed to investigate and present certain mitigating evidence. The circuit court dismissed the petition without an evidentiary hearing on motion of the State. In ordering the dismissal, the court specifically ruled that “[t]here's nothing remarkable about the Defendant's argument in support of the petition for post-conviction relief. This Court finds the allegations do not rise to a significant deprivation of rights under the constitutions of the United States and the State of Illinois.” This appeal followed.

ANALYSIS

We begin our analysis with a discussion of the standard of review to be employed in this case. Defendant argues that the correct standard is one of 
de novo
 review. In support of his position, defendant points out that a post-conviction petitioner is entitled to an evidentiary hearing when the allegations in the petition make a substantial showing of a deprivation of rights under the United States and/or Illinois Constitutions. Moreover, defendant notes that in determining whether an evidentiary hearing is required, the circuit court must take all well-pleaded facts in the petition and affidavits as true. See 
People v. Caballero
, 126 Ill. 2d 248 (1989). As such, defendant contends, the issues raised in this case are purely legal and the decisions of the circuit court in this regard are not entitled to any deference by a court of review. The State, on the other hand, maintains that the determinations of the circuit court in post-conviction matters will not be disturbed on review unless they are manifestly erroneous.

A proper standard of review cannot be articulated without first examining the substantive and procedural backdrop against which the appealed order or ruling arose. The Illinois Post-Conviction Hearing Act provides a mechanism by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. See 725 ILCS 5/122–1 (West 1994). Proceedings under the Act are commenced by the filing of a petition in the circuit court in which the original proceeding took place. The petition must clearly set forth the respects in which the petitioner's rights were violated. See 725 ILCS 5/122–2 (West 1994). Section 122–2 of the Act requires that affidavits, records, or other evidence supporting the petition's allegations be attached to the petition. See 725 ILCS 5/122–2 (West 1994).

Section 122–2.1 of the Act directs the circuit court to dismiss the petition if the petitioner is sentenced to imprisonment and if the court determines that “the petition is frivolous or is patently without merit.” 725 ILCS 5/122–2.1(a)(2) (West 1994); see also 
People v. Brisbon
, 164 Ill. 2d 236, 242-43 (1995) (discussing the Act's differing procedures for prisoners under sentence of death and those sentenced to imprisonment). We note that section 122–2.1 does not contemplate any type of responsive pleading by the State to be filed at that time. If a petition is not dismissed under section 122–2.1, then it is to be docketed and considered in accordance with sections 122–4 through 122–6 of the Act (725 ILCS 5/122–2.1(b) (West 1994)). In such cases and in the cases of petitioners under sentence of death, section 122–5 directs that the State shall either answer or move to dismiss the petition. In the event that a motion to dismiss is filed and denied, the State must file an answer within 20 days after such denial. See 725 ILCS 5/122–5 (West 1994). Under section 122–6, the court may receive proof by affidavits, depositions, oral testimony or other evidence. If the court finds in favor of the petitioner, it shall enter an appropriate order. See 725 ILCS 5/122–6 (West 1994).

As the foregoing statutory scheme makes clear, post-

conviction relief is limited to constitutional deprivations which occurred at the original trial. This court has construed the Act to require

“that when a petition is filed invoking the act, the trial court shall examine the petition with a view to determining whether the allegations of fact, liberally construed in favor of the petitioner, and taken as true, make a showing of imprisonment in violation of the Federal or State constitution, such as, for example, conviction upon a coerced confession, conviction by the use of testimony known by prosecuting officers to be perjured, coercion of a plea of guilty, or that the accused was prevented by public officials from summoning witnesses in his defense.

If the petition so charges, the trial court should ascertain whether it is supported by accompanying affidavits and if not, whether the absence of such affidavits is sufficiently explained and excused by the petitioner's own sworn statements. Where there are no supporting affidavits and their absence is neither explained nor excused, the trial court should either dismiss the petition or grant a further time within which such affidavits may be obtained.

A petition meeting these requirements, both to substantial allegations of the denial of a constitutional right and as to affidavits, is sufficient to invoke the act. Such a petition calls for an answer from the State's Attorney and a hearing on the merits.” 
People v. Jennings
, 411 Ill. 21, 26 (1952).

Thus, at the dismissal stage of a post-conviction proceeding, whether under section 122–2.1 or under section 122–5, the circuit court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act.
(footnote: 2) Moreover, our past holdings have foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding. 
People v. Caballero
, 126 Ill. 2d 248, 259 (1989); see also 
People v. Wegner
, 40 Ill. 2d 28, 31-32 (1968) (recognizing that factual disputes raised by the pleadings require a determination of the truth or falsity of the supporting affidavits or exhibits, a determination which cannot be properly made at a hearing on motion to dismiss, but rather can only be resolved through an evidentiary hearing).

Although a post-conviction petitioner is not entitled to an evidentiary hearing as a matter of right, this court has repeatedly stressed that a hearing is required whenever the petitioner makes a substantial showing of a violation of constitutional rights. See, 
e.g.
, 
People v. Hobley
, 182 Ill. 2d 404, 428 (1998); 
People v. Gaines
, 105 Ill. 2d 79, 91-92 (1984). To accomplish this, the allegations in the petition must be supported by the record in the case or by its accompanying affidavits. 
Gaines
, 105 Ill. 2d at 91-

92. Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. 
People v. West
, 43 Ill. 2d 219, 223 (1969); 
People v. Smith
, 40 Ill. 2d 562, 564 (1968). We note that if the allegations contained in the petition are based upon matters of record, no extrinsic evidence may be required. See 
People v. Jones
, 66 Ill. 2d 152, 157 (1977) (noting that a court may properly dismiss a post-conviction petition if the record of proceedings at trial shows the petition to be nonmeritorious); 
People v. Morris
, 43 Ill. 2d 124, 128 (1969) (holding that upon a motion to dismiss, the circuit court may render its decision on the basis of what is contained in the pleading, considered with the transcript of the proceeding). In fact, this court has consistently upheld the dismissal of a post-

conviction petition when the allegations are contradicted by the record from the original trial proceedings. 
Gaines
, 105 Ill. 2d at 91-92; 
People v. Arbuckle
, 42 Ill. 2d 177, 182 (1969). On the other hand, when a petitioner's claims are based upon matters outside the record, this court has emphasized that “it is not the intent of the [A]ct that [such] claims be adjudicated on the pleadings.” 
People v. Airmers
, 34 Ill. 2d 222, 226 (1966). See also 
People v. Clements
, 38 Ill. 2d 213, 216 (1967) (same). Rather, the function of the pleadings in a proceeding under the Act “is to determine whether the petitioner is entitled to a hearing.” 
Airmers
, 34 Ill. 2d at 226. Therefore, the dismissal of a post-conviction petition is warranted only when the petition's allegations of fact–liberally construed in favor of the petitioner and in light of the original trial record–fail to make a substantial showing of imprisonment in violation of the state or federal constitution.

Our analysis thus far has been limited to (i) what the Act requires of a petitioner and (ii) how the circuit court should evaluate the allegations contained in the petition when assessing their sufficiency to invoke relief under the Act. We must now determine, in light of the above discussion, what measure of review should be afforded to the circuit court once it has rendered its decision concerning the sufficiency question. We acknowledge that this court, in the past, has not charted an entirely clear course with respect to the standard of review to be utilized upon the dismissal of a post-conviction petition–in fact, our case law suggests that this relatively straightforward issue is susceptible to multiple answers. For example, several of our opinions have held that a dismissal of a petition without an evidentiary hearing will not be disturbed absent an abuse of discretion. See, 
e.g.
, 
People v. Madej
, 177 Ill. 2d 116, 127 (1997); 
People v. Whitehead
, 169 Ill. 2d 355, 370-71 (1996). Other opinions have held that the same determination will not be disturbed unless it is manifestly erroneous. See, 
e.g.
, 
People v. Maxwell
, 173 Ill. 2d 102, 107 (1996); 
People v. Silagy
, 116 Ill. 2d 357, 365 (1987). The latter cases, of course, do not cite the cases that employ the abuse of discretion standard for the same question. However, one might argue that the two standards are not truly that different. Both require an appellate court to view the circuit court's actions deferentially. As the Seventh Circuit has aptly noted, there exist “verbal distinctions within the deferential category (clear error, substantial deference, abuse of discretion) [that] have little consequence in practice.” 
Johnson v. Trigg
, 28 F.3d 639, 643 (7th Cir. 1994). Our task is to determine what amount of deference, if any, must a court of review give to the circuit court's decision to dismiss a post-conviction petition without an evidentiary hearing. In deciding this question, we do not mean to express an opinion on the correctness of any prior decision. In light of the arguments presented in this appeal, however, we believe that it is appropriate at this time to clarify this area of the law, not only for the litigants in the instant case, but for those in future cases, as well.

We initially turn to the manifestly erroneous standard, which this court first applied to a dismissal of a post-conviction petition without an evidentiary hearing in 
People v. Silagy
, 116 Ill. 2d 357 (1987). In so doing, the court stated, without analysis, that

“[a]t a hearing under the Post-Conviction Hearing Act, the burden is on the defendant to establish a substantial deprivation of rights under the United States Constitution or the Constitution of Illinois [citations], and determinations by the trial court will not be disturbed unless manifestly erroneous (
People v. Griffin
 (1985), 109 Ill. 2d 293, 303; 
People v. Bracey
 (1972), 51 Ill. 2d 514).” 
Silagy
, 116 Ill. 2d at 365.

However, neither 
Griffin
 nor 
Bracey
, the two cases cited by the 
Silagy
 court as authority for the manifestly erroneous standard, concerned the 
dismissal
 of post-conviction petitions without an evidentiary hearing. Rather, the question presented to this court in each case was whether the circuit court properly 
denied 
post-

conviction relief 
after
 a full evidentiary hearing had been conducted. See 
People v. Griffin
, 109 Ill. 2d 293 (1985); 
People v. Bracey
, 51 Ill. 2d 514 (1972). A review of this court's precise language in 
Bracey
 demonstrates that the “manifestly erroneous” standard applied to credibility determinations made at the evidentiary stage of the proceeding:

“ 'The credibility of the testimony in a post-conviction case, as in other cases tried by the court without a jury, is a matter for the trial judge to determine, and unless something appears to show that the determination by the trial judge was manifestly erroneous, the trial judge, who had an opportunity to see and hear each witness[,] will be upheld.” 
Bracey
, 51 Ill. 2d at 517.

Implicit in the 
Bracey
 court's comments is the understanding that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a “position of advantage in a search for the truth” which “is infinitely superior to that of a tribunal where the sole guide is the printed record.” 
Johnson v. Fulkerson
, 12 Ill. 2d 69, 75 (1957). See also 
People v. Calhoun
, 22 Ill. 2d 31, 34 (1961). Nevertheless, the 
Silagy
 court offered no explanation for its decision to utilize the same standard of review applicable to rulings made by the circuit court after an evidentiary hearing to decisions made by the circuit court at a dismissal hearing. Nor did it explain why the dismissal decision was entitled to deferential review.

The manifestly erroneous standard represents the typical appellate standard of review for findings of fact made by a trial judge. See M. Davis, 
A Basic Guide to Standards of Judicial Review
, 33 S.D.L. Rev. 469, 470-71 (1988). For this reason, we question the continued use of this standard in cases where a post-

conviction petition has been dismissed without an evidentiary hearing. At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. The inquiry into whether a post-

conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations. The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. Due to the elimination of all factual issues at the dismissal stage of the post-conviction proceeding, a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law. In such cases, the use of a standard of review which has been historically tailored to the review of factual and credibility determinations is difficult to legally justify. Accordingly, we believe the manifestly erroneous standard is only appropriate when reviewing the propriety of an order of the circuit court granting or denying post-

conviction relief at the conclusion of the evidentiary stage of the proceeding.

We next turn to those cases which hold that an order dismissing a post-conviction petition without an evidentiary hearing will be reviewed under an abuse of discretion standard. This court's decisions in both 
Whitehead
 and 
Madej
 cite to an appellate court case, 
People v. Hanrahan
, 132 Ill. App. 3d 640 (1985), as authority for the abuse of discretion standard. 
Hanrahan
, in turn, cites to another decision of the appellate court, 
People v. Reed
, 84 Ill. App. 3d 1030 (1980), as authority for the same proposition. In 
Reed
, the appellate court reviewed an order of the circuit court which denied an evidentiary hearing on a post-

conviction petition which contained allegations of perjury. The court began its analysis by noting that “[i]t is obvious that the initial question in such a proceeding is whether sufficient allegations of perjury have been shown.” 
Reed
, 84 Ill. App. 3d at 1039-40. The court further stated that “in determining whether the trial court properly dismissed a petition, all well-pleaded facts in the *** petition *** will be treated as admitted.” 
Reed
, 84 Ill. App. 3d at 1040. The court then stated that “[i]t is also clear that the denial of an evidentiary hearing is discretionary and will not be reversed absent a manifest abuse of discretion. 
People v. Stanley
 (1972), 50 Ill. 2d 320, ***; 
People v. Dean
 [28 Ill. App. 3d 196 (1975)].” 
Reed
, 84 Ill. App. 3d at 1040.

Interestingly enough, neither of the two cases cited by the appellate court in 
Reed
 contain the phrase “abuse of discretion.” This court's opinion in 
Stanley
 did not even address the dismissal of a post-conviction petition; rather, the court reviewed the propriety of the circuit court's 
denial
 of post-conviction relief after an evidentiary hearing. Indeed, this court stated that “[t]he trial court heard evidence *** and ruled adversely to the defendant. We will not disturb the findings of the trial court unless the same are manifestly erroneous.” 
People v. Stanley
, 50 Ill. 2d 320, 322 (1972). In 
Dean
, the appellate court reviewed an order of the circuit court which 
denied
 post-conviction relief without an evidentiary hearing. The circuit court did not conduct an evidentiary hearing because the information needed to adjudicate the petitioner's claim was contained in the record and in the affidavits supplied by the parties. 
People v. Dean
, 28 Ill. App. 3d 196, 201 (1975). On appeal, the appellate court concluded that it would not disturb the circuit court's decision “unless it was manifestly erroneous.” 
Dean
, 28 Ill. App. 3d at 201. 
Dean
, therefore, in no way holds that the dismissal of a petition for post-

conviction relief is subject to an abuse of discretion standard of review. Nevertheless, the 
Reed
 court did not explain its citation of either 
Stanley
 or 
Dean
 for the abuse of discretion standard. Nor did the court elaborate on why it deemed the decision to hold an evidentiary hearing to be a matter of discretion.

We note that courts of review have traditionally reserved the abuse of discretion standard for those decisions of the lower court which deserve great deference on review, 
i.e.
, decisions made by the trial judge in overseeing his or her courtroom or in maintaining the progress of a trial. See 33 S.D.L. Rev. at 480. The standard has been recognized as “the most deferential standard of review available with the exception of no review at all.” 33 S.D.L. Rev. at 480. In our view, the use of so deferential a standard to review the dismissal of a post-conviction petition is questionable. The decision to dismiss a post-conviction petition does not require a true exercise of discretion by the circuit court. In fact, no discretion is to be employed at this stage of the litigation–where the petitioner alleges sufficient facts which demonstrate a constitutional deprivation, this court has construed the Act to require the circuit court to proceed to the evidentiary stage of the proceeding so that a full evidentiary record can be made, replete with findings of fact. All factual inquiries into the petition's allegations are eliminated at this stage of the proceedings; therefore, the circuit court's inquiry is limited solely to the sufficiency of the allegations. Such a determination, in general, encompasses a “uniquely legal dimension” (
Miller v. Fenton
, 474 U.S. 104, 116, 88 L. Ed. 2d 405, 414, 106 S. Ct. 445, 452 (1985)) which, historically, has never been subject to discretionary review in this state.
(footnote: 3)
In light of the foregoing, we are of the opinion that the ultimate question regarding the sufficiency of the allegations contained in a post-conviction petition merits treatment as a legal inquiry requiring plenary appellate review. Several reasons compel our conclusion. The hallmark of deferential review is that although the reviewing court might have viewed the matter differently, it lacks the authority to change the result on appeal. The question raised in an appeal from a order dismissing a post-conviction petition is whether the allegations in the petition, liberally construed and taken as true, are sufficient to invoke relief under the Act. Due to the elimination of all factual issues at the dismissal stage of a post-conviction proceeding, the question is, essentially, a legal one, which requires the reviewing court to make its own independent assessment of the allegations. Thus, a court of review should be free to substitute its own judgment for that of the circuit court in order to formulate the legally correct answer. Under either of the deferential standards of review discussed above, however, a reviewing court does not have the power to so act. In our view, an appellate court should enjoy the freedom to substitute its judgment for that of the lower court upon review of a dismissal of a post-conviction petition. We must point out that the circuit court is not in an appreciably better position than the reviewing court to determine whether the allegations contained in a post-conviction petition demonstrate a constitutional deprivation so as to invoke relief under the Act. A court of review has the same capability as does the circuit court in the first instance to look to the allegations and construe them liberally in favor of the petitioner and as set forth in light of the trial record. As such, there is little justification for deference to be given to the circuit court's conclusions as to the sufficiency of a petition's allegations. Accordingly, we hold that the appropriate standard for this question is that of plenary review.

We acknowledge that our decision today on the standard of review marks a departure from previous holdings of this court. Therefore, we also hold that, in the interests of justice and public policy (see, 
e.g.
, 
Deichmueller Construction Co. v. Industrial Comm'n
, 151 Ill. 2d 413, 416 (1992); 
Elg v. Whittington
, 119 Ill. 2d 344, 357 (1987)), the standard of review announced in this opinion shall be applied to all future appeals and those that are pending at the time this decision becomes final in this court. With the above principles firmly in mind, we now turn to the substantive issues raised in this appeal.

Perjury and Prosecutorial Nondisclosure Claims

Defendant initially claims that the State knowingly used false testimony at trial and failed to disclose certain exculpatory evidence to the defense in violation of the United States Supreme Court's holding in 
Brady v. Maryland
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Specifically, defendant contends that Aldene Lockett's affidavit, which was attached to his petition, makes a substantial showing that the State obtained his conviction through the knowing use of false testimony and requires an evidentiary hearing. Defendant further asserts that his post-

conviction allegations substantially show that the State failed to disclose to the defense the fact that (i) Lockett told police that defendant did not have the same complexion as the gunman she had seen leave the drug house and (ii) Lockett told police that the gunman was someone she had recognized from the neighborhood and that she had never seen defendant in her neighborhood. Defendant argues that had these disclosures been made, defense counsel could have more effectively undercut the “tentative” trial identification made by Lockett, whom he describes as the State's only disinterested witness.

The State, in contrast, maintains that defendant has “misphrased” this issue, which the State views as concerning only witness recantation. The State insists that recantation testimony has historically been deemed “unreliable” and that courts will usually deny a new trial in such cases where the court is not satisfied that such testimony is true. In support of this argument, the State relies on 
People v. Dotson
, 163 Ill. App. 3d 419 (1987), 
People v. Ellison
, 89 Ill. App. 3d 1 (1980), and 
People v. Smith
, 59 Ill. App. 3d 480 (1978). Each of these cases, however, is factually inapposite to the instant case because in each, the circuit court conducted a hearing at which the credibility of the recanting witness was assessed by the trier of fact. In our view, the State's reliability argument is premature here, given the case's procedural posture. Defendant's allegations, supported by Lockett's affidavit, have not been refuted or denied. The original trial record, although regular on its face, does not controvert the charges that perjured evidence was used and that favorable evidence was suppressed with knowledge by the State. In fact, there has been no determination of the veracity of these allegations. By seeking to dismiss the post-conviction petition, the State assumed the truth of the factually supported allegations contained in that petition, at least for purposes of the motion. Therefore, the State, as the movant, has eliminated all factual issues from the inquiry. For this reason, the State cannot now on appeal seek affirmance of the dismissal order by arguing that Lockett's recantation is incredible or untrustworthy. Had the State wished to test Lockett's credibility, the State should have 
answered
 the petition, rather than seeking to dismiss it, for the latter action raises solely the question of the sufficiency of the pleadings, as a matter of law, and admits the pleadings solely for purposes of deciding the legal question. As we have discussed earlier in this opinion, the Act contemplates that factual and credibility determinations will be made at the evidentiary stage of the post-conviction proceeding, and not at the dismissal stage. We will therefore assume the truth of the allegations and review this matter as a question of law in light of 
Brady
 and its progeny.

In 1963, the United States Supreme Court held that in criminal prosecutions the State has an affirmative duty to disclose evidence favorable to a defendant. 
Brady v. Maryland
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Thirteen years later, in 
United States v. Agurs
, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349, 96 S. Ct. 2392, 2397 (1976), the Court described “three quite different situations” to which the general rule of 
Brady
 applies and set forth varying tests of materiality to determine whether a criminal conviction must be overturned. In the first situation described by the Court, the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. 
Agurs
, 427 U.S. at 103, 49 L. Ed. 2d at 349, 96 S. Ct. at 2397. The fundamental unfairness of a conviction obtained through the use of false evidence has long been recognized by both this court and the Supreme Court as a violation of due process. See 
Giglio v. United States
, 405 U.S. 150, 153-54, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972); 
Napue v. Illinois
, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959); 
Pyle v. Kansas
, 317 U.S. 213, 215-16, 87 L. Ed. 214, 216, 63 S. Ct. 177, 178 (1942); 
Mooney v. Holohan
, 294 U.S. 103, 112, 79 L. Ed. 791, 794, 55 S. Ct. 340, 342 (1935); 
People v. Olinger
, 176 Ill. 2d 326, 345 (1997); 
People v. Brown
, 169 Ill. 2d 94, 103 (1995); 
People v. Jimerson
, 166 Ill. 2d 211, 223 (1995): 
People v. McKinney
, 31 Ill. 2d 246, 247 (1964). As the Court in 
Agurs
 noted, such conduct not only violates constitutionally mandated disclosure obligations, but “involve[s] prosecutorial misconduct” and constitutes a “corruption of the truth-seeking function of the trial process.” 
Agurs
, 427 U.S. at 104, 49 L. Ed. 2d at 350, 96 S. Ct. at 2397. For this reason, the Court has imposed a “strict standard of materiality” in cases where the prosecution uses evidence that it knew or should have known was false. In such a case, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. 
Agurs
, 427 U.S. at 103, 49 L. Ed. 2d at 349-50, 96 S. Ct. at 2397. We note that this standard of materiality is the most lenient to the defendant.

The second situation to which 
Brady
 applies “is characterized by a pretrial request for specific evidence” followed by the prosecution's noncompliance with the request. 
Agurs
, 427 U.S. at 104, 49 L. Ed. 2d at 350, 96 S. Ct. at 2397. The Supreme Court did not define the standard of materiality applicable in this situation, but suggested that it might be more lenient to the defense than in a situation in which the defense makes no request or even a general request. In this respect, the Court noted that “[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.” 
Agurs
, 427 U.S. at 106, 49 L. Ed. 2d at 351, 96 S. Ct. at 2399.

The final situation identified by the Court in 
Agurs
 occurs when the defense makes either no discovery request or only a general request for “
Brady
” material, and exculpatory matter is withheld by the prosecution. In this third situation, the standard of materiality is more favorable to the State. The defendant will be entitled to a new trial only if the undisclosed evidence, viewed in the context of the entire record, creates a reasonable doubt that otherwise would not exist. 
Agurs
, 427 U.S. at 112, 49 L. Ed. 2d at 355, 96 S. Ct. at 2402.

The Supreme Court abandoned the distinction between the second and third 
Agurs
 categories, 
i.e.
, the “specific request” and the “general or no request” situations, in 
United States v. Bagley
, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). There, the Court held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” 
Bagley
, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. The Court clarified the 
Bagley
 definition of materiality in the recent case of 
Kyles v. Whitley
, 514 U.S. 419, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995). In determining materiality for either the second or third categories, the Court in 
Kyles
 emphasized that a showing of materiality does not require demonstration by a preponderance that disclosure would have resulted ultimately in defendant's acquittal. 
Kyles
, 514 U.S. at 434, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. Rather, the inquiry turns on whether the “[g]overnment's evidentiary suppression 'undermines confidence in the outcome of the trial' ”, which, the Court stressed, "is not a sufficiency of evidence test.” 
Kyles
, 514 U.S. at 434, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566, quoting 
Bagley
, 473 U.S. at 678, 87 L. Ed. 2d at 491, 105 S. Ct. at 3381. Materiality is demonstrated “by showing that the favorable evidence could reasonably be taken to put the whole case is such a different light as to undermine confidence in the verdict.” 
Kyles
, 514 U.S. at 435, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. Moreover, once a reviewing court applying 
Bagley
 has found constitutional error, that error “cannot subsequently be found harmless.” 
Kyles
, 514 U.S. at 436, 131 L. Ed. 2d at 507, 115 S. Ct. at 1567. Finally, the cumulative effect of the suppressed evidence also informs the materiality determination. 
Kyles
, 514 U.S. at 436-

37, 131 L. Ed. 2d at 507, 115 S. Ct. at 1567.

We note that, in the instant case, the State's alleged conduct would fall within both the first and third 
Brady
 categories. It is within the first category because Lockett's testimony that the lineup participant “could have been” the gunman was known by the State to be false. The State's conduct falls within the third category because Lockett's alleged statements made at the lineup were exculpatory. In our opinion, where undisclosed 
Brady
 material undermines the credibility of specific testimony that the State otherwise knew to have been false, the standard of materiality applicable to the first 
Agurs
 category applies. In such circumstances, the failure to disclose is “part and parcel of the presentation of false evidence to the jury and therefore 'corrupt[s] *** the truth-seeking function of the trial process,' [citation] and is a far more serious act than a failure to disclose generally exculpatory material.” 
United States v. Vozzella
, 124 F.3d 389, 392 (2d Cir. 1997). Therefore, the standard of materiality in this case is whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. 
Agurs
, 427 U.S. at 103, 49 L. Ed. 2d at 349-50, 96 S. Ct. at 2397. Accordingly, we can affirm the circuit court's decision to dismiss this claim without an evidentiary hearing only if we can conclude, as a matter of law, that the allegedly false testimony (which we must assume is true for purposes of the motion to dismiss) does not fall within this strict standard of materiality.

Our review of the trial record reveals that the State's case against defendant was predicated upon several inculpatory statements made by defendant to various acquaintances that he had committed the murders at the drug house as a means of obtaining revenge on Alex McCullough. Defendant's theory of the case was that someone else had committed the drug house murders and that it was McCullough who was the aggressor in their relationship. At trial, Lockett could not positively identify defendant as the man she saw leaving the drug house. However, she testified that the lineup participant who refused to put on sunglasses (later identified by police witnesses as defendant) “could have been” the same man she had seen leave the murder scene because “he had the same height, and build, and 
color
.” (Emphasis added.) Furthermore, Chicago police Detective Tony Maslanka testified that Lockett told him that defendant “was the individual whom she saw that day in question with regard to height, physical build, and complection [
sic
].” On cross-examination, Maslanka qualified Lockett's identification as “tentative” solely because Lockett had told him that she had not been wearing her glasses when she saw the suspect leave the building and that she was nearsighted. Lockett's trial testimony, corroborated as it was by Maslanka, was damaging to the defense because it suggested that defendant was the gunman because he shared three physical characteristics with the gunman. In her affidavit, however, Lockett now states that while at the lineup, she “felt that the police were trying to get me to single out the male who refused to put on the shades, because they went back to him in the lineup and told me that this was the guy we picked up for the murders. I told them that this guy was not dark enough to be the guy who had come out of the downstairs apartment.” According to Lockett, she informed Assistant State's Attorney Michael Kelly that the man in the lineup “
didn't look like the guy I saw
 come out of the downstairs apartment.” (Emphasis added.) This version of Lockett's recollection of the lineup would have greatly enhanced the defense's theory of the case because it suggests that defendant was 
not
 the same man she had seen leave the drug house. We further note that Lockett's affidavit not only calls into question her own trial testimony, but the trial testimony of Maslanka as well, for it offers a new explanation for her “tentative” lineup identification–the police and the assistant State's Attorney applied pressure on her to say that defendant was the gunman.

After reviewing the entire transcript of the original trial, we are unable to conclude that there exists no reasonable likelihood that Lockett's allegedly false testimony would not have affected the jury's deliberative process and judgment. In addition to Lockett, four other witnesses provided evidence which tended to establish defendant's participation in the double homicide. Each testified that defendant told them, in great detail, of the killings. We note, however, that two of these witnesses were men who were under police suspicion themselves, a fact which defense counsel brought to the jury's attention through cross-examination. Another was the sister of one of the men, and the fourth was a jail-house informer, whose credibility was severely challenged both on cross-

examination and in the defendant's case in chief. We simply cannot speculate how the jury might have assessed the credibility of these other witnesses' testimony had the true nature of Lockett's lineup statements to police been before it.

In light of the above, it is readily apparent that the allegations contained in defendant's post-conviction petition were sufficient to make a substantial showing of a constitutional violation and to require an evidentiary hearing to determine if the violation did in fact occur. See 
People v. Martin
, 46 Ill. 2d 565, 568 (1970) (reversing order of dismissal and remanding for an evidentiary hearing on allegations regarding alleged perjurious testimony); see also 
Olinger
, 176 Ill. 2d at 345 (same). The circuit court's dismissal of the 
Brady 
claim without an evidentiary hearing was improper and therefore requires reversal. On remand, the circuit court is instructed to proceed to the evidentiary stage of the post-

conviction proceeding with respect to this claim.

Ineffective Assistance of Counsel at Trial

Defendant further alleges that he received ineffective assistance of counsel during trial because his attorney did not investigate and interview several witnesses. Had counsel done so, defendant maintains, he would have learned (i) that Lockett described the gunman as darker than defendant and (ii) that defendant's sister, Laurarence, initially told police that defendant shot at McCullough only after McCullough had fired at defendant. Defendant contends that this latter evidence would have damaged the motive for the double murder ascribed by the State to defendant, 
i.e.
, revenge against McCullough, and would have corroborated defendant's trial testimony.

Ineffective assistance of counsel claims are judged under the now familiar standard set forth by the United States Supreme Court in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In order to establish ineffective assistance of counsel, a defendant must first demonstrate that his defense counsel's performance was deficient in that “counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment.” 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2063. In so doing, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. 
People v. Barrow
, 133 Ill. 2d 226, 247 (1989). Secondly, a defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceeding would have been different. 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both prongs of the 
Strickland
 test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. Courts, however, may resolve ineffectiveness claims under the two-part 
Strickland
 test by reaching only the prejudice component, for lack of prejudice renders irrelevant the issue of counsel's performance. See 
People v. Erickson
, 161 Ill. 2d 82, 90 (1994); 
People v. Albanese
, 104 Ill. 2d 504, 525-27 (1984).

A. 
Failure to Interview Aldene Lockett

Defendant contends that his attorney was ineffective for his failure to interview Lockett. Defendant claims that a competent attorney would have interviewed Lockett before trial because Lockett was the only witness in the State's case in chief who could testify as to defendant's presence at the drug house at the time of the murders. Given the defense theory of the case, 
i.e.
, that defendant did not commit the double murder, we agree. The failure to interview witnesses may be indicative of deficient representation, particularly when, as in this case, the witnesses are known to trial counsel and their testimony may be exonerating. 
People v. Greer
, 79 Ill. 2d 103 (1980). As noted in the above discussion concerning defendant's 
Brady
 claims, we cannot deem Lockett's testimony immaterial to defendant's conviction. We, therefore, are of the opinion that the allegations of ineffective assistance of counsel with respect to Lockett were sufficient to require an evidentiary hearing to determine if the violation did, in fact, occur.

B. 
Failure to Investigate the Circumstances of the

McCullough Shooting

Defendant next contends that his attorney was ineffective because he failed to investigate the circumstances surrounding defendant's shooting of Alex McCullough. At trial, defendant's sister, Laurarence, testified that McCullough forced his way into her sister's apartment. He did not have a gun in his hand at the time. Laurarence stated that as she began to run toward the rear of the apartment, defendant “started to shoot and by that time McCullough had his gun out.” Defendant now claims that had his attorney undertaken an investigation into McCullough's shooting, he would have discovered that Laurarence told the responding police officers that McCullough was armed with a revolver when he forcibly entered the apartment. In support of this claim, defendant attached to his petition the affidavit of Chicago police officer Michael Keith. In the affidavit, Keith states he and his partner were the responding officers at the scene of the McCullough shooting. According to Keith, defendant's sister, as well as two other witnesses at the scene, related to him that McCullough forced his way into the apartment with gun in hand. Defendant asserts that had counsel been diligent in uncovering this evidence, his sister could have been impeached at trial with her prior inconsistent statement by a Chicago police officer. Defendant also contends that this evidence would have negated the State's theory that defendant committed the double homicide at the drug house as part of a vendetta defendant had against McCullough.

We need not determine whether defendant has satisfied the deficiency prong of 
Strickland
 because even if we were to assume substandard representation on the part of defense counsel, defendant cannot establish the requisite prejudice under 
Strickland
 with respect to this claim. Our examination of the original trial record reveals that the jury was well aware of the possibility that McCullough might have been the aggressor in the shootout. All of the witnesses to the shooting agreed that McCullough had brought a gun with him to the apartment. One of the witnesses, Victor Truell, acknowledged on cross-examination that he told defense counsel and a defense investigator that he had lied about who had fired the first shot while testifying before the grand jury regarding the circumstances of the McCullough shooting. During defendant's case in chief, an investigator for the defense testified that Truell admitted to him that McCullough had fired the first shot at defendant. Defendant himself testified that McCullough shot at him first, and defendant also testified about a previous incident in March 1989 in which McCullough shot at him and his girlfriend. This latter testimony was corroborated by one other defense witness. Contrary to defendant's assertions, the possible impeachment of Laurarence was not, in our view, strong enough to negate the State's theory that defendant had committed the drug house murders. Defendant's own testimony that McCullough shot at him and his girlfriend could have, in and of itself, provided a motive for revenge on the part of defendant. For these reasons, we find the impeachment value of Officer Keith's testimony to be limited, particularly in light of the fact that defendant had instructed the witnesses to tell the responding officers that the shooting was an act of self-defense. Officer Keith's affidavit makes no mention of who fired the first shot, but merely relates that Laurarence told him McCullough forced his way into the apartment with a gun in his hand. Such an initial statement to police would lay the groundwork for a case of self-defense. Given all of the evidence that was before the jury, we fail to see how counsel's failure to uncover this evidence and his failure to use it to impeach Laurarence would have changed the outcome of the trial. Therefore, because defendant's allegations fail to make a substantial showing of a violation of defendant's right to effective assistance with regard to this claim, the dismissal of this portion of defendant's petition without an evidentiary hearing was proper.

Cumulative Effect of Trial Errors

Defendant next asserts that even if any of the above alleged errors are singularly insufficient to warrant an evidentiary hearing, their “cumulative prejudicial effect” demands that an evidentiary hearing be ordered. Having individually assessed the merits of each of the alleged trial errors, we see no legal justification for defendant's argument and thus summarily reject it.

Ineffective Assistance of Counsel at Sentencing

Defendant next asserts that he was denied ineffective assistance of counsel at sentencing because counsel failed to investigate potential sources of mitigation and failed to present the evidence that such an investigation would have uncovered. As a result, defendant asserts that he was denied a meaningful and individualized assessment of the appropriateness of the death penalty at his sentencing hearing. In support of this claim, defendant has attached to his petition seven affidavits of various family members, including Carl McKee (defendant's first cousin), Alma McKee Newsome (defendant's paternal aunt), Reverend Walter McKee (defendant's paternal uncle), Jennie Truell Davis (defendant's maternal aunt), Fredericka Coleman (defendant's oldest sister), Bobbie Jean Truell (cousin of defendant's mother), and Marvin Truell (defendant's brother). Each of these affiants, in essence, state that defendant is the product of an impoverished, chaotic household in which he was subjected to chronic abuse and neglect. The affiants describe defendant's parents as life-long drug abusers who frequently moved their family from home to home and who involved each of their children in illicit drug activities. According to these family members, defendant began using drugs at the age of thirteen and developed a long-term dependence on them. Defendant also dropped out of school during the seventh grade and began selling drugs at the age of 13. As a result of this lifestyle, defendant did not receive adequate preparation for gainful employment, but rather spent his youth and young adulthood involved in “the culture of illicit drugs,” culminating in “multiple contacts” with law enforcement authorities. Each of the affiants state that defense counsel never contacted them about testifying on defendant's behalf.

Defendant's petition also contains a psychological evaluation prepared by a clinical psychologist, who interviewed defendant twice in 1995. The report states that as a result of his abusive background and early use of drugs, defendant has “low average” intelligence, suffers from extreme emotional disturbance, and is prone to impulsive behavior. During April of 1989 defendant's “state of mind was extremely troubled and he was suffering from extreme emotional disturbance.” The evaluation states that, if kept away from the negative influences of his family and drugs, defendant is “a good candidate for continued institutional adjustment” who “is not a risk for violence toward prison staff or officers nor is he a risk toward other inmates within [the] general population of a prison.” Defendant's petition was also supported by a social history investigation and report prepared by a mitigation specialist for the Capital Resource Center. This report reiterates the findings made in the psychological report and the statements contained in the affidavits submitted by defendant's relatives.

Relying on 
People v. Emerson
, 122 Ill. 2d 411 (1987), the State initially maintains that defendant has waived this claim because the record affirmatively demonstrates that defendant made a conscious decision to forgo the presentation of mitigating evidence at the sentencing hearing. We acknowledge that the original trial transcript contradicts several of defendant's post-

conviction allegations because defense counsel expressly told the court that he had spoken with various members of defendant's family and that defendant had prevented them from testifying in mitigation. Moreover, the record reveals that when the circuit court, 
sua sponte
, ordered a PSI defendant refused to cooperate with the probation officer assigned to compile the report. Had defendant cooperated in the preparation of the report, some of the evidence now presented in this post-conviction proceeding would have been brought to the sentencing judge's attention. Nevertheless, we are reluctant to resolve this issue on either the basis of waiver or our holding in 
Emerson
, given the fact that the federal courts have criticized 
Emerson
's approach to this issue. See 
People v. Madej
, 177 Ill. 2d 116, 133-35 (1997) (acknowledging that the Seventh Circuit Court of Appeals has taken a position contrary to this court's holding in 
Emerson
 on the issue of a knowing and intelligent waiver of the right to present evidence in mitigation); 
Emerson v. Gramley
, 91 F.3d 898 (7th Cir. 1996) (affirming issuance of writ of 
habeas corpus
 because evidence did not support a finding of a constitutional knowing and intelligent waiver of the right to present mitigating evidence). We, therefore, will examine defendant's assertions on their merits. In so doing, we will assume the truth of all defendant's well-pleaded allegations in conformity with the procedural posture of this case. In other words, we will presume that had defense counsel called these witnesses, they would have testified in a manner consistent with their affidavits and that the proffered evidence would have been considered by the sentencing judge as required under our death penalty statute.

As with alleged claims of ineffectiveness occurring during the guilt phase of the trial, the standard for determining whether a defendant has received constitutionally deficient representation at a capital sentencing hearing is governed by the standard enunciated in 
Strickland
. As such, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, absent the errors, the judge “ 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'  ” 
People v. Henderson
, 171 Ill. 2d 124, 145 (1996), quoting 
Strickland
, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. In our view, even if this court were to assume that defendant has satisfied the first prong of 
Strickland
, 
i.e.
, counsel was deficient for failing to amass and present this evidence, we cannot say that defendant has suffered prejudice from the deficiency.

We first address defendant's history of drug abuse. This court, like others, has recognized that a history of substance abuse is a double-edged sword at the aggravating/mitigating phase of the penalty hearing. For example, in 
People v. Shatner
, 174 Ill. 2d 133, 159 (1996), we stated that “[s]imply because the defendant views his drug abuse history as mitigating does not require the sentencer to do so.” In 
Shatner
, as in this case, defendant claimed the sentencing judge should have found that defendant's history of drug abuse was a factor relating to his criminal behavior. We rejected that argument on the following grounds:

“Underlying this premise is that since drugs are partly to blame for his actions, the defendant is somehow less culpable and should not suffer the ultimate penalty for his criminal behavior. Simply stated, the sentencing judge was under no legal obligation to subscribe to this suggestion. To the contrary, the sentencing judge was free to conclude, under the circumstances, that defendant's drug history simply had no mitigating value but was, in fact, aggravating.” 
Shatner
, 174 Ill. 2d at 160.

Consistent with this conclusion, we do not believe that the circuit judge in this case was required to view the purported negative effects of defendant's drug abuse as a mitigation factor.

Notwithstanding the above, defendant cites 
People v. Perez
, 148 Ill. 2d 168 (1992), to support his contention that counsel's deficiency resulted in prejudice to him, particularly in light of the fact that defendant Perez also came from an abusive family situation. 
Perez
, however, is distinguishable from the instant case in several important aspects. Unlike defendant, Perez suffered from a mental handicap, which resulted in his abandonment by his entire family. In contrast, the affidavits of several of defendant's family members in this case indicate that defendant was not similarly abandoned, but had, from time to time, stayed with them in drug-free environments. These affidavits evince a degree of familial support that was utterly lacking in 
Perez
. We note that this evidence could have been viewed as aggravating in that defendant had experienced living in a home environment away from the drug culture and yet, despite this exposure, still chose to immerse himself in that culture as he became older. Additionally, unlike 
Perez
, this defendant has a great deal of aggravating evidence that is overwhelming when compared to the proffered mitigation.

The aggravating evidence in the instant case established that defendant methodically planned the armed robbery of the drug house. Upon his arrival at the drug house window, defendant pretended to purchase drugs. Once the victim, Lance Hale, had turned to retrieve the drugs, defendant shot him once in the head, firing the shot through the window. Defendant then entered the apartment and turned his attention to the second victim, Avis Welch. Welch begged defendant for her life, but defendant nevertheless ordered her to get down on the floor and then shot her in the back of the head at point blank range. Defendant thereafter took $400 from Hale, as well as three rings and a gold chain from the drug house. We note that defendant's statements to his acquaintances about the murders, as established in the trial record, reveal a chilling lack of remorse for these crimes. The State's evidence also established that defendant had a history of criminal behavior, beginning as a youth and continuing until his arrest for the instant murders. Furthermore, the State adduced extensive evidence of defendant's disciplinary record while he had been previously incarcerated. This evidence revealed, among other things, that defendant had assaulted a correctional officer, caused a dangerous disturbance, threatened and intimidated other prisoners and officers, participated in gang activity, and threatened to burn the prison down. This latter evidence, coupled with the fact that the instant murders occurred only three months after defendant was released from the Department of Corrections, lends substantial credence to the circuit court's apt conclusion that defendant lacked rehabilitative potential.

With respect to the proffered evidence of the impairment of defendant's emotional development, this court has repeatedly held that “information about a defendant's mental or psychological impairment is not inherently mitigating.” 
People v. Tenner
, 175 Ill. 2d 372, 382 (1997), citing 
People v. Sanchez
, 169 Ill. 2d 472, 491-92 (1996). As we explained in 
Tenner
, “[a]t sentencing, a judge or jury considering evidence of this nature might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness.” 
Tenner
, 175 Ill. 2d at 382 (and cases cited therein). In light of the aggravating evidence adduced in this case, we believe that even if we were to deem the alleged psychological evidence as mitigating, such evidence would not “preclude imposition of a death sentence when that evidence is outweighed by [the] aggravating evidence.” 
People v. Pulliam
, 176 Ill. 2d 261, 286 (1997), citing 
People v. Wilson
, 164 Ill. 2d 436, 460 (1994). Moreover, defendant's disciplinary record while incarcerated, as established in the original record, belies the psychological report's recommendation of defendant as “a good candidate for continued institutional adjustment” who “is not a risk for violence toward prison staff or officers nor is he a risk toward other inmates within [the] general population of a prison.”

In view of the foregoing, we cannot say that, but for counsel's failure to amass and present the proffered evidence, the judge would have concluded that “the balance of aggravating and mitigating circumstances did not warrant death.” 
Strickland
, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. We, therefore, hold that defendant's post-conviction allegations, liberally construed in his favor and taken as true in light of the original trial record, fail to make a substantial showing of a violation of defendant's right to effective assistance of counsel at the sentencing hearing. The circuit court properly dismissed this portion of the petition without an evidentiary hearing.

CONCLUSION

In summary, the circuit court improperly dismissed defendant's post-conviction petition without an evidentiary hearing with respect to the allegations concerning Aldene Lockett's trial testimony and her statements made to police at the lineup. Accordingly, we remand the matter to the circuit court with instructions to hold an evidentiary hearing as to these claims. We affirm the circuit court's order dismissing defendant's petition in all other respects.

Affirmed in part and reversed in part;

cause remanded with instructions.

FOOTNOTES
1:     
The record contains numerous variations of defendant's sister's name. Her trial testimony, however, reveals the correct spelling to be Laurarence. For clarity and consistency, we will utilize this spelling of the name throughout this opinion.  

2: In cases of 
pro se
 petitioners under sentence of imprisonment for a term of years, this court has acknowledged that only the “gist” of a constitutional claim need be asserted in order to survive dismissal under section 122–2.1 and to require the appointment of counsel under the Act. See 
People v. Porter
, 122 Ill. 2d 64, 84 (1988).

3: Examples of these principles in the civil arena abound.  See, 
e.g.
, 
Vernon v. Schuster
, 179 Ill. 2d 338, 344 (1997); 
In re Marriage of Siegel
, 271 Ill. App. 3d 540, 542-43 (1995); 
T&S Signs, Inc. v. Village of Wadsworth
, 261 Ill. App. 3d 1080, 1084 (1994); 
Toombs v. City of Champaign
, 245 Ill. App. 3d 580, 583 (1993).