FIFTH DIVISION
November 5, 2010

1-08-2841

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 92 CR 5788 |
| | ) | |
| DANIEL GARCIA, | ) | The Honorable |
| | ) | Marcus R. Salone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TOOMIN delivered the opinion of the court:

In the present appeal, we consider a postconviction claim premised, in part, on the findings of an allegedly discredited serologist. During the course of second-stage proceedings, the State's motion to dismiss was granted. Defendant appeals contending: (1) an evidentiary hearing is required to assess his claims regarding the testing of physical evidence, ineffectiveness of counsel, and the availability of testing to support his claim of actual innocence; (2) he made a substantial showing of ineffectiveness of appellate counsel and a violation of his due process rights; and (3) postconviction counsel's performance violated the mandate provided under Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)). For the reasons that follow, we affirm.

BACKGROUND

In 1997, defendant, Daniel Garcia, was convicted of murder, aggravated kidnaping, and robbery following a jury trial and sentenced to terms of imprisonment of 80 years, 15 years, and 7 years, respectively. His codefendant, Benjamin Kirk, was also convicted in a simultaneous bench trial. Defendant appealed contending: (1) the admission of highly inflammatory testimony deprived him of a fair trial; (2) the evidence was insufficient to prove his guilt of aggravated kidnaping; (3) counsel was ineffective prior to and during trial; and (4) his sentence was excessive. We affirmed his conviction and sentence. *People v. Garcia*, No. 1-97-1049 (1998) (unpublished order under Supreme Court Rule 23).

The facts of defendant's case are derived from the trial evidence reflected in the summary order disposing of defendant's direct appeal, coupled with our review of the trial record. Here, we recite those facts necessary to a resolution of the second-stage dismissal of his postconviction petition. On February 8, 1992, the body of Margaret Anderson was found beneath a viaduct near the intersection of the 3000 block of North Sacramento Avenue and the John F. Kennedy Expressway in Chicago. The 78-year-old victim was found by a passerby beaten almost beyond recognition and naked from the waist down.

Responding officers found Anderson's body lying on her back atop a ledge beneath the expressway. Officers were initially unable to determine either her race or her age due to the condition of her face. Although no identification was found near the body, a set of keys was located that opened the doors to Anderson's apartment. Thereafter, the victim's niece, Mary Wentland, identified Anderson's body at the office of the Cook County medical examiner.

2

According to Wentland, Anderson wore eyeglasses. The medical examiner's testimony revealed that Anderson suffered numerous injuries to her face, knees, and thigh. Additionally, evidence of brain hemorrhages was identified and it was further determined that Anderson sustained a broken neck. Her injuries were consistent, in part, with being struck in the face. The medical examiner further opined that the fractured neck resulted from Anderson's head being forcefully struck against the concrete ledge beneath the viaduct.

Chicago police officers Cruz Reyes and Nathaniel Hill testified to their canvass of the surrounding area several days after the discovery of Anderson's remains. One of the sources they spoke with was Rosie Cintron, who was known to the officers as a prostitute and drug user. Reyes and Hill met Cintron outside Johnnie's Grill, a location drug dealers, addicts, and prostitutes were known to frequent. The officers described her reaction to their questioning about the murder as being "taken aback." Nevertheless, Cintron voluntarily accompanied the officers in their car to discuss the murder. She was taken to police headquarters at Grand and Central, where the investigation was turned over to the detectives working the case.

According to Cintron's testimony, she knew both defendant and codefendant, Kirk. At the time of Anderson's murder, Cintron was an active drug user, who supported herself by prostitution and selling drugs. She testified that on February 7, 1992, she got high with the defendants at a crack house on Albany. She claimed she was high throughout the day and into the night. Cintron left the crack house with defendant in a cab. Eventually, she exited the cab at defendant's direction because he and codefendant "were going to score." Later that morning Cintron again saw the defendants running past her into the crack house. They did not speak to

her at that time. Eventually the defendants exited the building and Cintron spoke to defendant. When defendant came outside, he showed Cintron rocks of crack cocaine and a "golden bracelet." According to Cintron, defendant indicated that he had to sell the bracelet, "get rid of it."

Cintron next saw defendant a few days later at a hotel, when defendant explained how he and codefendant, Kirk, had watched a lady from the viaduct. When she walked by, codefendant grabbed her and began to beat her. According to Cintron, defendant "said that [codefendant] was nothing but an animal and he was brutal." Defendant claimed they took a gold bracelet from the victim, which was the same one he had previously showed Cintron. Defendant described the victim as an old lady with glasses. At some point, Kirk threw the glasses onto the expressway.

Cintron made a voluntary statement concerning the foregoing to police. She identified the defendants from police photographs. At trial, Cintron conceded that some of her testimony before the grand jury was not truthful.

Following his arrest on February 14, 1992, defendant gave a written statement to Assistant State's Attorney Theodore Kmiec, which was published to the jury. According to the statement, defendant and Kirk were outside Johnnie's Grill at about 5 a.m. on February 8, 1992. They opted to go steal things in order to get money. As they walked along Diversey Avenue, they decided to steal audio equipment from a Mazda parked on the street. Kirk was the lookout while defendant removed the stereo.

Defendants continued down Diversey toward Sacramento. Upon turning northbound onto Sacramento, they encountered an older woman wearing glasses. Defendants observed jewelry on

her person, which they believed to be gold. Kirk suggested they steal the woman's purse, to which defendant agreed. In furtherance of this plan, Kirk confronted the woman while defendant stood behind her. Kirk attempted to grab her purse. The victim struggled and resisted against his efforts. Kirk punched the woman in the face and then demanded the victim's jewelry. The woman refused and asked why she should give it to him. After Kirk struck the woman another time, defendant told her to surrender her jewelry in order to avoid being hit again. Defendant told Kirk to remove her bracelet and stop striking her. Kirk responded that defendant should keep quiet and "keep watching out." Defendant watched as Kirk grabbed the woman by the hair and dragged her up the incline below the viaduct.

According to defendant, he became frightened by all the cars driving in the area and ran back to Johnnie's Grill. Approximately an hour after defendant departed the viaduct, codefendant arrived at Johnnie's and summoned defendant outside. Defendant exited the restaurant and shook hands with Kirk. When he did, he found a gold bracelet on his palm. It was the same bracelet they saw the old woman wearing. As he tendered the bracelet to defendant, Kirk cautioned, "you did not see anything."

The parties also stipulated to the testimony of serologist and microbiologist Pamela Fish. At the time of trial she had been employed by the Illinois State Police crime laboratory for approximately six months. Before that, Fish worked at the Chicago police crime laboratory, which was closed and folded into the Illinois State Police laboratory. If called to testify, Fish would describe receiving swabs from Anderson's vagina, mouth, and rectum. Having utilized acceptable methods in the scientific community, it was her opinion that those swabs were

5

negative for the presence of spermatozoa or semen.  Next, she would testify that her testing of a

swab "containing a reddish brown substance *** taken from the sidewalk of 3030 North

Sacramento" indicated the substance was human blood, but the sample was "insufficient *** to

test the blood type."  Likewise, a second sample taken from the ledge beneath the viaduct was

determined to be human blood, but the sample was insufficient to conduct blood typing.

Furthermore, she would testify that while a jacket found beneath the viaduct was tested for the

presence of blood, the results were negative.

Defendant testified on his own behalf.  He claimed he was arrested and taken to the 14th

District police station, where he repeatedly denied knowing anything about Anderson's murder.

Notwithstanding his denials, the detectives hit and punched him, pulled his hair, and kicked him.

Defendant further claimed the detectives planted keys and an identification card in his jacket.

During a subsequent interview he was struck in the head with a telephone book, causing him to

fall and lacerate his arm.  He was told each time he denied being involved he would be struck

with the book.  Defendant claimed he was struck four to seven times.  According to defendant, he

ultimately gave a statement to get the beatings to stop so that he could go home.  The assistant

State's Attorney did not ask defendant what he knew about Anderson's murder.  Defendant did

not read the statement in its entirety prior to signing it.  However, he told the prosecutor about his

treatment at the hands of the detectives.  Defendant denied involvement in the robbery or murder.

Moreover, he testified that Cintron's testimony was driven by her anger toward him for not

giving her money for cocaine.

Defendant's conviction and sentences were affirmed on direct appeal.  On August 17,

1999, defendant filed a *pro se* postconviction petition, wherein he claimed ineffective assistance of trial counsel, specifically in the examination of Rosie Cintron, as well as ineffective assistance of appellate counsel, based, in part, on his failure to raise the issue of trial counsel's ineffectiveness. On December 2, 1999, the trial judge summarily dismissed defendant's petition. On March 12, 2001, we remanded the cause for second stage proceedings on defendant's motion because the dismissal occurred beyond the statutory 90-day period for summary dismissals.

Pursuant to remandment, the public defender was appointed as counsel for defendant. Thereafter, counsel filed a "Supplemental Petition for Post-Conviction Relief," adopting defendant's initial petition and supplemental amendment, as well as the documents and exhibits appended to the pleadings. Moreover, postconviction counsel also averred that, "with the following amendments, the *pro se* petition, the *pro se* supplemental amendment thereto, and the exhibits filed by the petitioner adequately present his claims to this court." Additionally, the supplemental petition added claims faulting appellate counsel based on defendant's assertions of trial counsel's alleged ineffectiveness. According to postconviction counsel, a number of these claims were "apparent from the face of the record." As noted, the trial court granted the State's motion to dismiss, thereby denying an evidentiary hearing. This appeal followed.

ANALYSIS

We first address defendant's contention that he is entitled to an evidentiary hearing to establish the falsity of Pamela Fish's report regarding the testing of physical evidence. Tangential to this claim is an assertion that the State knowingly used perjured testimony – through Fish – to obtain defendant's conviction. Additionally, defendant maintains trial counsel

was ineffective in failing to challenge Fish's findings. Thus, defendant concludes: "DNA testing of the evidence has the potential to prove Garcia's actual innocence in a very weak case."

As defendant's petition was denied at the second stage of postconviction proceedings, our review is *de novo*. *People v. Whitfield*, 217 Ill. 2d 177, 182-83, 840 N.E.2d 658, 662 (2005). In *Whitfield*, our supreme court offered a concise summary of the tenets of law we must apply on review:

> "The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West [2008]))
> provides an avenue by which a defendant may challenge his conviction or sentence
> for violations of federal or state constitutional rights. [Citations.] To be entitled to
> postconviction relief, a defendant must demonstrate that he has suffered a substantial
> deprivation of his federal or state constitutional rights in the proceedings that
> produced the conviction or sentence being challenged. [Citation.] The scope of the
> postconviction proceeding is limited to constitutional matters that have not been, and
> could not have been, previously adjudicated. Accordingly, any issues which could
> have been raised on direct appeal, but were not, are procedurally defaulted and any
> issues which have previously been decided by a reviewing court are barred by the
> doctrine of *res judicata*. [Citation.]" *Whitfield*, 217 Ill. 2d at 183, 840 N.E.2d at 663.

Moreover, in reviewing second-stage dismissals, we accept all well-pled allegations in the petition as true, unless they are positively rebutted by the record. *People v. Lander*, 215 Ill. 2d 577, 586, 831 N.E.2d 596, 601 (2005).

As noted, defendant claims the State knowingly used perjury to obtain his conviction.

1-08-2841

Essentially, defendant maintains that Pamela Fish's findings, that (1) two blood samples were insufficient for testing, (2) the oral, vaginal, and rectal swabs did not contain sperm or semen, and (3) the jacket belonging to the homeless man sheltered beneath the viaduct did not contain blood, when coupled with her having been "discredited" and her prior testimony having "been proven false" in other collateral proceedings, renders her stipulated testimony perjurious. Although we must accept the veracity of well-pled allegations at this stage, we are not compelled to give credence to immaterial allegations. Our consideration of the issue makes clear that in making a substantial showing that a constitutional right was violated, it was incumbent upon defendant to demonstrate Fish's testimony was material.

As a threshold matter, we find instructive our Sixth Division's reasoning in *People v. Smith*, "Materiality is demonstrated 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *People v. Smith*, 352 Ill. App. 3d 1095, 1102, 817 N.E.2d 982, 990 (2004), quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 131 L. Ed. 2d 490, 506, 115 S. Ct. 1555, 1566 (1995). Furthermore, "Materiality 'is not a sufficiency of evidence test.' " *Smith*, 352 Ill. App. 3d at 1102, 817 N.E.2d at 990, quoting *Kyles*, 514 U.S. at 434, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. For the purposes of this analysis we are also guided by our supreme court's interpretation of materiality in the context of *Brady* discovery violations in *People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998). There, the court explained, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' "

9

*People v. Coleman*, 183 Ill. 2d 366, 393, 701 N.E.2d 1063, 1077 (1998), quoting *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). Consequently, we may affirm a second-stage dismissal without an evidentiary hearing, "if we can conclude, as a matter of law, that the allegedly false testimony (which we must assume is true for purposes of the motion to dismiss) does not fall within this strict standard of materiality." *Coleman*, 183 Ill. 2d at 394, 701 N.E.2d at 1078.

When considered against the record, the trial court could well have concluded that defendant's claim manifestly lacks materiality. We, too, are unable to say that, but for Fish's input, defendant's trial would have ended differently. *Coleman*, 183 Ill. 2d at 393, 701 N.E.2d at 1077. Even assuming the trial judge had concluded that Fish's findings were false, we fail to see how defendant was harmed by her stipulated testimony. None of the evidence adduced at trial tended to show defendant had direct physical contact with the victim. Defendant's own statement, which he claimed was the product of coercion and beaten out of him, clearly distanced himself from the victim. Moreover, there was nothing tending to indicate defendant bled or secreted in any form or fashion during the encounter with the victim. This is in marked contrast to *Smith*, which defendant cites. In *Smith*, on appeal the State argued Fish's testimony was not material. However, that claim was diametrically opposed to the affirmative reliance the State placed upon her testimony at trial to connect the defendant to the crime. *Smith*, 352 Ill. App. 3d at 1103, 817 N.E.2d at 991.

In the case *sub judice* the State made no meaningful attempt to connect defendant to the crime scene by forensic evidence. Proof that defendant's bodily fluids were not present on the

victim or the location where she was found avails defendant nothing. Therefore, we perceive that the trial court could properly have concluded that the allegedly perjured findings of Pamela Fish was immaterial, even assuming her testimony could be proven to be perjurious. In any event, aside from this reasoning, we do not perceive her testimony constituted perjury.

Defendant asserts a related claim of ineffective assistance of trial counsel, stemming from counsel's failure to submit various pieces of evidence for forensic testing and his stipulation to Fish's findings. To prevail on a claim of ineffective assistance of counsel, a defendant must establish that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) defendant was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Adherence to the *Strickland* standard, requires defendants to demonstrate that counsel's performance fell below an objective standard of reasonableness and there is a reasonable probability prejudice occurred as a result. *People v. Villarreal*, 198 Ill. 2d 209, 228, 761 N.E.2d 1175, 1185 (2001). Counsel's actions are judged in a "highly deferential" fashion and courts endeavor to "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Authorities of every stripe universally hold that effective assistance amounts to competent, not necessarily perfect, representation. *People v. Johnson*, 372 Ill. App. 3d 772, 778, 867 N.E.2d 49, 54 (2007). There is a strong presumption counsel's performance fell within the spectrum of reasonable professional assistance. *People v. Cunningham*, 376 Ill. App. 3d 298, 301-02, 875 N.E.2d 1136, 1140-41 (2007). Furthermore, "the fact that another attorney might have pursued a different strategy is not a factor in the competency determination." *People v.*

11

1-08-2841

*Palmer*, 162 Ill. 2d 465, 476, 643 N.E.2d 797, 802 (1994); *People v. Fuller*, 205 Ill. 2d 308, 330-31, 793 N.E.2d 526, 541-42 (2002) (issues of trial strategy must be viewed, not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions).

Sufficient prejudice will be found to exist where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Erickson*, 183 Ill. 2d 213, 224, 700 N.E.2d 1027, 1032 (1998). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Failure to demonstrate either deficient performance or prejudice is fatal to an ineffectiveness claim. *Palmer*, 162 Ill. 2d at 475-76, 643 N.E.2d at 801. Nonetheless, ineffectiveness claims can be disposed on the prejudice prong alone, without establishing whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

On direct appeal, defendant made numerous allegations of trial counsel's ineffectiveness. See *People v. Garcia*, No. 1-97-1049 (1998) (unpublished order pursuant to Supreme Court Rule 23). Ordinarily, the failure to argue a claim on direct appeal operates as a procedural default of postconviction claims, while those disposed of previously are barred by the doctrine of *res judicata*. *Whitfield*, 217 Ill. 2d at 183, 840 N.E.2d at 663. In the present case, however, defendant's present claims do not fit precisely within either of these categories. Nevertheless, our review of them suggests they are of dubious merit. Viewing, as we must, defendant's claims

12

from the standpoint of trial counsel at the time the challenged decisions were made (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065), we discern they were reasonable strategic decisions.

Defendant's defense to the fatal beating of Anderson was, essentially, "I was not there, I did not do this." This position seemingly negates the necessity of testing the evidence collected. The results the parties stipulated to were inconclusive. Therefore, they were neutral to defendant's case. Further testing could serve to provide additional inconclusive results or, even worse, undermine the defense by potentially implicating defendant. The latter option is patently problematic. Leaving the forensic evidence as – at worst – a neutral factor, trial counsel made a reasonable strategic decision. Likewise, the decision to stipulate to Fish's testimony, as well as that of the fingerprint analyst, was also a reasonable strategic decision. We fail to discern that trial counsel's performance was deficient in this regard.

Even were we to conclude counsel's performance was constitutionally deficient, we would not find any prejudice inured to defendant. As noted, the forensic evidence adduced at trial did not inculpate defendant or otherwise impair his defense. Therefore, we fail to perceive how additional testing or refusing to stipulate to the Fish's testimony would have advanced his defense. We, therefore, conclude defendant's claim of ineffective assistance of trial counsel is without merit.

Adherence to fundamental principles dictates that defendant's additional claim of actual innocence also must fail. In order to successfully advance a claim of actual innocence, the proponent must demonstrate the evidence offered is: (1) newly discovered; (2) material and

noncumulative; and (3) "of such conclusive character that it would probably change the result on retrial." *People v. Collier*, 387 Ill. App. 3d 630, 636, 900 N.E.2d 396, 403 (2008). Evidence qualifies as "newly discovered" if it was not available at trial and defendant, in the exercise of diligence, could not have uncovered it sooner. *Collier*, 387 Ill. App. 3d at 636, 900 N.E.2d at 403. According to defendant, "Since 1992, there have been historic developments in forensic testing, increasing the reliability of forensic identification over earlier techniques. Thus, an evidentiary hearing is required to determine whether these new techniques may be utilized on this evidence." The first proposition is undeniably true. The second proposition is a *non sequitur*.

As noted repeatedly, defendant's conviction was not based upon forensic evidence. Moreover, since defendant's strategy at trial was to claim he removed himself from the offense when Kirk continued striking the victim and did not participate thereafter, there was nothing to be gained by testing evidence collected beneath the viaduct. Nothing in the record places defendant there. Additional testing that would, presumably, show no forensic contribution by defendant plainly does not support a claim of actual innocence. Defendant claims, "This testing has the potential to prove [his] innocence." That assertion, however, falls well short of making the requisite substantial showing of actual innocence. Putting aside whether current forensic technology could yield "newly discovered" evidence, defendant's elusive claim ignores the criteria of materiality and conclusiveness of character required to produce a different result on retrial. Again, the trial judge could reasonably have concluded additional testing would avail defendant nothing.

Our reasoning in this regard stems from the supreme court's conclusion in *People v.*

14

*Savory*, 197 Ill. 2d 203, 756 N.E.2d 804 (2001). There, defendant sought testing of a bloodstain on a pair of trousers, pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 1998)). The supreme court rejected the claim, concluding the testing would not yield materially relevant evidence in light of the entirety of the record. In the court's view, the source of the blood stain was only a "minor part" of the State's case, but defendant's knowledge of "certain features of the crime scene" played a far greater role. *Savory*, 197 Ill. 2d at 214-15, 756 N.E.2d at 811. The court reasoned: "Under these circumstances, a test result favorable to defendant would not significantly advance his claim of actual innocence, but would only exclude one relatively minor item from the evidence of guilt marshaled against him by the State." *Savory*, 197 Ill. 2d at 215, 756 N.E.2d at 811-12.

In the case *sub judice*, the postconviction court could well have discerned the same conclusion foreclosed further consideration of this claim. See also *People v. Gecht*, 386 Ill. App. 3d 578, 584, 899 N.E.2d 448, 454 (2008) (relying, *inter alia*, on *Savory*, appellate court concluded: "biological evidence played no significant role in defendant's trial and the evidence of defendant's guilt is overwhelming. Accordingly, any DNA testing would not significantly advance defendant's claim of actual innocence or produce evidence materially relevant to defendant's assertion of actual innocence"; *People v. Bailey*, 386 Ill. App. 3d 68, 76-77, 897 N.E.2d 378, 386 (2008) (relying on *Savory*, court ruled testing sought by defendant pursuant to section 116-3 motion was not materially relevant of a claim of actual innocence when considered against the trial record)). In defendant's case, like *Savory*, we fail to discern what aspect of the State's case would be undermined or called into question by the evidence defendant seeks.

1-08-2841

Notably, biological evidence played no meaningful role in defendant's trial. *Gecht*, 386 Ill. App. 3d at 584, 899 N.E.2d at 454. As such, it was a reasonable conclusion on the part of the trial court to determine that forensic evidence could not be said to have established even partial proof of any element of the offenses charged.

We next consider defendant's assertion that he was substantially denied his right to effective appellate counsel. Defendant claims appellate counsel handling his direct appeal was ineffective for not raising trial counsel's ineffectiveness "in failing to argue that trial counsel should have impeached Cintron *** and that the prosecution's failure to correct her false testimony violated his right to due process." According to defendant, counsel should have impeached Cintron based upon her admissions of dishonesty when she was cross-examined by codefendant's counsel outside the presence of defendant's jury.

We review challenges to the constitutional effectiveness of appellate counsel against the same *Strickland* standard applicable to trial counsel. *People v. Petrenko*, 237 Ill. 2d 490, 497, 931 N.E.2d 1198, 1203 (2010). In short, defendants must satisfactorily establish that appellate counsel's performance was deficient and that, were it not for counsel's shortcomings, the outcome of the appeal would have been different. *Petrenko*, 237 Ill. 2d at 497, 931 N.E.2d at 1203; *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. As noted, a claim of ineffectiveness can be resolved based on the failure to establish deficient performance or prejudice. *Palmer*, 162 Ill. 2d at 475-76, 643 N.E.2d at 801.

Defendant's argument is necessarily premised on allegations of trial counsel's ineffectiveness. To succeed on this claim, defendant must show appellate counsel's performance

16

was objectively unreasonable and that defendant was prejudiced thereby. *People v. Rogers*, 197 Ill. 2d 216, 223, 756 N.E.2d 831, 835 (2001). Understandably, where the underlying claim is nonmeritorious, defendant cannot demonstrate prejudice. *Rogers*, 197 Ill. 2d at 223, 756 N.E.2d at 835; *People v. Jones*, 362 Ill. App. 3d 31, 35, 839 N.E.2d 539, 542-43 (2005) ("In order to establish that appellate counsel was deficient, defendant must demonstrate that her allegation of ineffective trial counsel was meritorious and that this court would have found as such had appellate counsel raised the issue on direct appeal").

Defendant's present claim is bottomed on the assertion that trial counsel was ineffective by failing to impeach Cintron on her admittedly false testimony at trial. In defendant's view, "Unlike the case against Kirk, [defendant's] conviction could not have been obtained without Cintron's testimony, and the testimony that she admitted to be false, outside of the presence of the jury, was vital to the State's case." We find this position is untenable against the record. Cintron acknowledged as false, "The stuff about [codefendant] and the stuff about the bracelet, the crack cocaine on the 7th and 8th [of February]." The record does not make clear the substance of the "stuff" referred to in codefendant's counsel's question that yielded Cintron's acknowledgment.

Affording great deference to the choices of counsel (*Fuller*, 205 Ill. 2d at 330-31, 793 N.E.2d at 541-42), our review of the record convinces us defense counsel's cross-examination of Cintron was thorough and more than adequate under the circumstances. Trial counsel explored numerous subject areas on cross-examination, including Cintron's numerous aliases, that she had prior convictions and was on mandatory supervised release at the time of trial, that she previously

used crack cocaine, that she went to prison for violating probation, that she smoked marijuana as recently as three weeks prior to trial, that she had worked as a prostitute, often to pay for her crack cocaine habit, that her memory of events around the time of the killing and her subsequent conversations with investigators was limited, and that she lied before the grand jury.

Defendant's ineffectiveness claim is necessarily blunted by the fact that none of the matters Cintron admitted to lying about at trial concerned the actual robbery, beating, and murder of Anderson. None of the information Cintron had, insofar as the charged offenses were concerned, was within her own personal knowledge but, rather, was provided by others. Nevertheless, although other attorneys might have seized upon this testimony, defense counsel's failure to do so does not render his assistance constitutionally ineffective. *Palmer*, 162 Ill. 2d at 476, 643 N.E.2d at 802. It is equally likely counsel determined Cintron's testimony sufficiently proved her a liar, without chronicling each lie across her existence. Moreover, an equally reasonable strategic approach was to avoid calling additional attention to the testimony, effectively discounting her testimony as vague and circumstantial. No matter the precise explanation, counsel's choice to limit the scope of examination was well within the realm of strategic decisions about which a claim of ineffectiveness generally will not lie. See *People v. Ramey*, 152 Ill. 2d 41, 54-55, 604 N.E.2d 275, 281 (1992). Therefore, we conclude trial counsel was not ineffective in this regard.

Having reviewed the order issued on direct appeal, as well as the entire record presently before us, we are convinced defendant has not and cannot establish prejudice. Essentially, defendant attempts to advance the fallacious argument that his appellate counsel was ineffective

because counsel's choices of issues to brief on direct appeal compelled defendant to raise additional – ultimately nonmeritorious – issues in a supplemental brief. This argument, if accepted, only goes to the performance prong of *Strickland*. Even if defendant could establish this prong, he would still fall short on the matter of prejudice because the issues were presented and resolved on direct appeal. Therefore, because defendant has not established prejudice, his claim of ineffectiveness as to appellate counsel fails.

Additionally, the present claim is properly barred by the doctrine of *res judicata*, as it was raised and resolved on direct appeal. *Whitfield*, 217 Ill. 2d at 183, 840 N.E.2d at 663. There, our Sixth Division addressed several claims of ineffectiveness by virtue of a supplemental brief submitted by defendant, including, *inter alia*, a claim of ineffectiveness of trial counsel based on the cross-examination of Cintron. This claim, along with the others present on direct appeal, was resolved unfavorably to defendant. Defendant's claim, then, is that appellate counsel's performance was deficient because those issues were raised by defendant in a supplemental brief. We are persuaded the same outcome would have obtained had they been raised by appellate counsel, instead of by defendant in the supplemental appellate brief. Nevertheless, this claim is barred by *res judicata*.

Defendant similarly claims that appellate counsel was ineffective for failing to raise the issue of the State's knowing use of false testimony, where prosecutors failed to correct Cintron's testimony. Defendant cites *People v. Olinger*, 176 Ill. 2d 326, 680 N.E.2d 321 (1997), for the proposition that the State has a duty to correct false testimony. This is an accurate portrayal of the holding in *Olinger*. However, the situation in the present case is factually distinguishable

from *Olinger*. There, a witness testified concerning the scope of the immunity he was granted. However, the State knew the scope of the immunity was much broader than what the witness described while testifying. *Olinger*, 176 Ill. 2d at 345-46, 680 N.E.2d at 331.

Cintron's testimony did not involve matters within the personal knowledge of the prosecutors. She took the stand and lied. The specifics of her version of events was something unique to her and only she knew the truth. On the other hand, the prosecutors in *Olinger* knew as well as the witness about the scope of the immunity. Moreover, defendant fails to specify how Cintron's testimony was so singularly damaging to his case. As noted, her testimony related to events before and after the offense and did not place defendant at the scene or committing any of the offenses charged. Defendant's position on Cintron's testimony conveniently disregards the other evidence against him, not the least of which was his written statement. Although he made every effort to distance himself from that statement – through accusations of coercion and physical abuse and claims of limited literacy and education – the verdict demonstrates the jury's opinion of his denials.

Based on our review of the record, we conclude appellate counsel did not render ineffective assistance in failing to raise this claim on appeal. Defendant has not established the outcome of the appeal would have been different, if this issue had been briefed. Therefore, he has not and cannot establish prejudice by virtue of the decision of appellate counsel not to raise every imaginable issue or nonmeritorious issues. *People v. Jones*, 219 Ill. 2d 1, 23, 845 N.E.2d 598, 610 (2006) ("Appellate counsel is not required to brief every conceivable issue on appeal and may refrain from developing nonmeritorious issues without violating *Strickland* [citation],

because defendant suffers no prejudice unless the underlying issue is meritorious [citation]").

Lastly, defendant claims postconviction counsel violated Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)). Rule 651(c) provides, in pertinent part:

"The record filed in [the appellate] court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner either by mail or in person to ascertain his contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." 134 Ill. 2d R. 651(c).

According to defendant, the record demonstrates that postconviction counsel "failed to make amendments necessary to properly present [defendant's] claims and unreasonably refused to obtain evidence necessary to support those claims." Postconviction counsel submitted a "Supplemental Petition for Post-Conviction Relief," which described the procedural history of defendant's case and indicated the steps counsel undertook pursuant to the responsibility imposed by Rule 651(c). Counsel further represented that he corresponded with defendant by letter. Additionally, counsel provided a summary of defendant's arguments in favor of granting him relief. As resolution of this issue requires us to construe a supreme court rule, our review is *de novo. Suarez*, 224 Ill. 2d 37, 41-42, 862 N.E.2d 977, 979 (2007).

The record before us demonstrates, beyond doubt, that counsel, at the very least, communicated with defendant about the petition by mail. His doing so is documented by the averment in the "Supplemental Petition." See 155 Ill. 2d R. 137 ("The signature of an attorney or

party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"). Further documentation is found in the record, including copies of correspondence between defendant and counsel. Additionally, counsel stated in the "Supplemental Petition" that he read the record and reiterated before the trial judge his fulfillment of this obligation.

Defendant's claim, then, must rest upon whether counsel "made any amendments to the petitions filed *pro se* that are *necessary for an adequate presentation* of petitioner's contentions." (Emphasis added.) 134 Ill. 2d R. 651(c). Defendant asserts that he "did not draft these claims in their proper legal form, where he did not cite relevant case law, did not use the relevant facts to support his claims, and where the claims are not cohesively argued, but appear sporadically throughout over 300 pages [of the petitions]." Even a cursory review of defendant's submissions belies this claim. While the drafting is not that of an experienced attorney, it is not clear where the form is improper. Although defendant is not an attorney, it is nonetheless apparent that his claims are indeed supported by relevant case law standing for the propositions relied upon. Some of the cited cases are not placed on the cutting edge; yet, they are far from irrelevant. Where the facts are concerned, defendant's submissions garner support from references to testimony, evidence, and exhibits highlighting his claims. Although some of the facts are recited repetitively, this does not undermine the thrust of the petition. Importantly, defendant's claims

are argued cohesively. For a *pro se* litigant, his command of the claims he intended to advance and his ability to marshal the facts and law in support is significant.

Defendant claims that postconviction counsel "must make any amendments that are necessary for an adequate presentation" of his claims. Our supreme court explained, in *People v. Perkins*, that the duties imposed by Rule 651(c) are mandatory. *People v. Perkins*, 229 Ill. 2d 34, 50, 890 N.E.2d 398, 407 (2007). However, there is no obligation on post conviction counsel to conduct a broader examination of the record in order to develop additional claims. *People v. Pendleton*, 223 Ill. 2d 458, 476, 861 N.E.2d 999, 1009 (2006). Counsel may demonstrate compliance with the rule by filing a certificate with the trial court representing that the required duties were fulfilled. *Perkins*, 229 Ill. 2d at 50, 890 N.E.2d at 407.

Although the record does not contain a specific certificate of compliance pursuant to Rule 651(c), a review of the "Supplemental Petition for Post-Conviction Relief" demonstrates that counsel was mindful of the requirements of the rule in preparing that submission. Moreover, as noted, counsel substantially complied with the requirements. In counsel's pleading is found the following, "Counsel states that with the following amendments, the *pro se* petition, the *pro se* supplemental amendment thereto, and the exhibits filed by the petitioner adequately present his claims to this court." The "Supplemental Petition" filed by counsel, while adopting the prior *pro se* submissions and summarizing the gist of those arguments, adds or amends those earlier pleadings to include additional claims. Consequently, the record demonstrates that trial counsel did, in fact, adhere to the requirements of Rule 651(c) by making amendments to the existing claims. His approach reflected a reasoned approach that permitted the original petition and

exhibits to remain before the court, through adoption, while distilling those claims and buttressing them with additional claims. Therefore, defendant's claim in this regard is without merit.

Defendant's allegation that postconviction counsel violated Rule 651(c) by not obtaining additional evidence, in whatever form, demonstrates a fundamental and critical misunderstanding of the scope of the rule. A plain reading of Rule 651(c) reveals no such duty placed upon postconviction counsel. Nothing in the language of the rule is reasonably subject to a construction that would impose such a requirement. Manifestly, the rule focuses on working in collaboration with the defendant and the record. No mention is made of seeking out additional evidence to support the claims asserted. As our supreme court observed in *People v. Johnson:* "While post-conviction counsel has an obligation to present a petitioner's claims in appropriate legal form, he is under no obligation to actively search for sources outside the record that might support general claims raised in a post-conviction petition." (Emphasis omitted.) *People v. Johnson*, 154 Ill. 2d 227, 247, 609 N.E.2d 304, 314 (1993). Consequently, postconviction did not violate Rule 651(c) by not pursuing additional evidentiary matters.

In a letter addressed to defendant, postconviction counsel indicated he would not seek DNA testing because "it would neither prove nor disprove any question at issue in your case." As noted earlier, we concur in counsel's appraisal. More importantly, though, the testing or results of DNA testing was not necessary for the presentation of defendant's claims. The results were not materially relevant to presenting the claims concerning Fish's testimony and counsel's performance at trial and on appeal. They were unnecessary to proper resolution of the motion to

dismiss defendant's petition for relief. Manifestly, defendant may have another procedural forum to obtain DNA testing at his disposal, should he choose to avail himself of it. See 725 ILCS 5/116-3 (West 2008). Although the State posits that defendant's claims can be resolved by such a motion, this issue is not properly before us. Nevertheless, exploring evidentiary matters does not fall within the ambit of Rule 651(c).

Defendant has failed to establish that postconviction counsel's representation was not in conformity with the requirements of Rule 651(c). Consequently, we conclude defendant's claim must fail.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

FITZGERALD SMITH, P.J., with HOWSE, J., concur.

1-08-2841

| | |
|---|---|
| Please Use Following Form: | |
| Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>     Respondent-Appellee,<br><br>v.<br><br>DANIEL GARCIA,<br><br>     Petitioner-Appellant. |
| Docket No.<br><br>COURT<br><br><br>Opinion Filed | No. 1-08-2841<br>Appellate Court of Illinois<br>First District, FIFTH Division<br><br>November 5, 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE TOOMIN delivered the opinion of the court:<br><br>FITZGERALD SMITH, P.J., with HOWSE, J., concur.   concur [s]<br><br>                dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Chancery Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable  Marcus Salone, Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel.  Indicate the word NONE if not represented.<br><br>Attorneys for Plaintiff-Appellee-People of the State of Illinois: Anita Alvarez<br>               State's Attorney<br>               County of Cook<br>               Room 309-Richard J. Daley Center,<br>               Chicago, IL  60602<br><br>Of counsel: Alan Spellberg, Mary Needham, William L. Toffenetti<br><br>Attorneys for Petitioner-Appellant:   MICHAEL J. PELLETIER<br>               State Appellate Defender<br><br>               ALAN D. GOLDBERG<br>               Deputy Defender<br><br>               CAROLINE E. BOURLAND |

Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, IL 60601
312/814-5472