2022 IL App (1st) 180192-U
No. 1-18-0192
Order filed June 13, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02 CR 15430 |
| JAMES DEGORSKI, | ) ) | The Honorable Vincent Michael Gaughan, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

_____

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justices Walker and Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the second-stage dismissal of Degorski's postconviction petition because he failed to make a substantial showing that the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and he failed to make a substantial showing that any of his trial or appellate counsels' many alleged deficiencies prejudiced him.

¶ 2     The State charged James Degorski and co-defendant, Juan Luna with multiple counts of first degree murder for the 1993 killings of seven employees at a Brown's Chicken restaurant in Palatine, Illinois. Following a severed jury trial, a jury found Degorski guilty, and he received a sentence of natural life imprisonment.

¶ 3    After direct appeal where this court affirmed the convictions, Degorski petitioned for postconviction relief. The trial court dismissed the petition at the second stage. Degorski now appeals, arguing: (i) the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence that a key witness had a monetary motive to testify, and (ii) his trial and appellate counsels were ineffective on several grounds.

¶ 4    We do not agree with any of Degorski's arguments. A common theme runs through our decision: Degorski has failed, either as a matter of law or due to insufficient factual support, to make a substantial showing that the claimed errors—if they are errors—impacted the outcome of his trial. Under *Brady*, he failed to show that the evidence the State withheld was material to his guilt or innocence; as to his ineffective assistance claims, he failed to show that counsels' allegedly deficient actions prejudiced him. We affirm.

¶ 5                                    Background

¶ 6    We recited the underlying facts in our opinion from Degorski's direct appeal. *People v. Degorski*, 2013 IL App (1st) 100580. During Degorski's trial, the parties presented multiple witnesses and exhibits. A jury found Degorski guilty and eligible for the death penalty but instead sentenced him to natural life in prison. We limit our description of the facts to those that relate to this appeal.

¶ 7                                *Motion to Suppress*

¶ 8    Evidence at a hearing on Degorski's pretrial motion to quash arrest showed that on May 16, 2002, Palatine police officers, who had been surveilling Degorski for several days, went to Indiana to "pickup" Degorski for questioning. See *People v. Degorski*, 382 Ill. App. 3d 135, 138 (2008). The police stated that they did not have an arrest warrant. Still, they asked Degorski if he

would voluntarily accompany them to Illinois for questioning. *Id*. Degorski agreed, and the officers took him to the Streamwood police station for interrogation. *Id*. The officers *Mirandized* Degorski and questioned him for about 10 hours, accompanied by an Assistant State's Attorney. Ultimately, Degorski admitted his involvement in the murders. *Id*. at 138-139. The State used his oral, unrecorded statements against him at trial.

¶ 9     At the hearing, both former Assistant State's Attorney Michael McHale and Palatine police sergeant Bill King testified that Degorski was not subjected to any coercive measures and freely and voluntarily spoke to them. They repeatedly gave him opportunities to eat, sleep, and use the washroom. McHale testified that Degorski told him he was treated well by the officers. Chief Koziol testified that he did not have any contact with Degorski and denied grabbing or squeezing Degorski's shoulders. Based on this evidence, the trial court ruled that Degorski's oral statements were voluntarily made, but his videotaped statement would be suppressed due to a *Miranda* violation. The State appealed, and this court reversed and remanded for the remainder of the trial proceedings. *Id.* at 147-48.

¶ 10                                  *Trial Evidence*

¶ 11     On the night of the murders, January 8, 1993, Brown's Chicken closed at 9:00 p.m. Shortly after closing time, seven employees were shot to death. The restaurant's trash cans were empty except for the remains of a four-piece chicken meal, a paper cup and napkins, and a cash register receipt. The cash register appeared to have been closed and reopened to sell a meal at 9:08 p.m. The receipt was consistent with the meal discovered in the trash can. A fingerprint found on a paper napkin matched codefendant Luna's fingerprint. DNA from one of the chicken bones matched Luna's DNA profile and excluded Degorski as a contributor to the sample.

¶ 12    In January 1993, the Village of Palatine passed a resolution to establish a fund for anyone with information leading to the arrest and conviction of whomever committed the murders. The fund existed until Degorski's and Luna's convictions, Luna in 2007 and Degorski in 2009.

¶ 13    At Degorski's trial, Eileen Bakalla testified that she was friends with Degorski and Luna. On the night of the murders, she received a telephone call from Degorski, asking her to meet them in a grocery store parking lot in Carpentersville, Illinois. Degorski said they had "done something big." Bakalla left work at 9:30 p.m. When she met up with Luna and Degorski, she noticed green rubber gloves in the back seat of Luna's car. Bakalla drove them to her townhouse. On the way, she asked about a canvas money bag they had with them. They told her that it contained money they had taken from Brown's Chicken.

¶ 14    While at Bakalla's home, Degorski and Luna split up the money. Degorski gave Bakalla $50 he owed her. The three smoked marijuana and stayed for a few hours. Bakalla then dropped Luna at his car. Bakalla and Degorski then drove past Brown's Chicken, where they saw ambulances and squad cars in the parking lot. Degorski told her that Luna had gone "ballistic and started killing people," "slit the owner's throat from ear to ear," and "put the rest of the employees in the cooler [and] in the freezer." Degorski said Luna shot four people in the cooler and handed the gun to him, and he shot two people in the freezer. They wore gloves, mopped the floor afterward, and threw the gun in the Fox River. Bakalla and Degorski went to Degorski's home, where they spent the night. The following day, they cleaned Luna's car at a carwash.

¶ 15    Bakalla testified she did not tell police about the murders until they approached her on May 15, 2002. Bakalla did tell her husband, Keith Abel, about the murders before their 1998

wedding. Abel testified that, in 1998, Bakalla told him that Degorski and Luna had done "something big" and mentioned Brown's Chicken.

¶ 16    Anne Lockett testified that she had dated Degorski and remained friends with him. She was also friends with Luna and Bakalla. In 1992 and 1993, Lockett frequently abused drugs and alcohol and twice attempted suicide. On January 9, 1993, she was hospitalized after a failed attempt, during which time she received a telephone call from Degorski, telling her to watch the news that night because he had "done something big." The lead story that night was about the murders.

¶ 17    Lockett left the hospital on January 25 and later met up with Degorski and Luna at Degorski's home. Degorski told her about the Brown's Chicken robbery and said they had already told Bakalla because they had to use her as an alibi. Degorski and Luna told Lockett that on the night of the murders they drove Luna's car to the restaurant. They placed a wedge behind the back door to prevent the employees' escape. Luna ordered a chicken dinner, upsetting Degorski, who was worried that Luna would leave fingerprints. Luna finished the meal and put the chicken bones in the restaurant garbage can. Luna and Degorski then went into the bathroom and put on gloves.

¶ 18    When they came out of the bathroom, Degorski and Luna crowded the employees into the freezer and cooler and shot them. Luna slit one woman's throat. Degorski and Luna then mopped the floor and wiped the area down to remove fingerprints. They later threw their clothes into a dumpster and threw the gun into the Fox River.

¶ 19    Degorski and Luna explained to Lockett that they had chosen Brown's Chicken because Luna had worked there. They also told Lockett that Luna wanted to see what it was like to kill someone, and Degorski agreed to help. They said they would kill Lockett if she told anyone.

¶ 20    Lockett also testified that Degorski owned a silver .38-caliber revolver that he kept in his bedroom, but she never saw it after her hospital discharge.

¶ 21    Degorski did not testify. The trial judge questioned Degorski:

> THE COURT: Mr. Degorski, I know your attorneys have explained to you that you have a right to testify in this case. They told you that?
>
> DEGORSKI: Yes.
>
> THE COURT: You heard me during voir dire examination say that anybody accused of a crime has two Constitutional rights. One is to testify and if they testify, their testimony would be judged as anybody else's; is that correct?
>
> DEGORSKI: Yes.
>
> THE COURT: All right. And then on the other flip side of that, of the Constitutional issue, is that you have a right not to testify; do you understand that, Mr. Degorski?
>
> DEGORSKI: Yes.
>
> THE COURT: And if you decide not to testify, then no inference can be drawn from your silence and I will instruct the jury as to that?
>
> DEGORSKI: Yes."

This exchange followed:

> "THE COURT: After consulting with your attorneys and knowing [these] Constitutional protections that you have, what is your desire about testifying?
>
> DEGORSKI: They said there's no need.
>
> THE COURT: I'm sorry. What do you say?
>
> DEGORSKI: No."

¶ 22    The jury found Degorski guilty of seven counts of murder, and he was sentenced to natural life imprisonment. In 2010, Lockett and a friend shared the $100,000 reward offered by the Village of Palatine because they "provided information that directly led to the conviction of Juan Luna and James Degorski."

¶ 23                                    *Direct Appeal*

¶ 24    On direct appeal, Degorski argued he was denied a fair trial because: (i) the trial court

allowed the testimony of one of the State's witnesses, a former assistant state's attorney, that he

believed Degorski's testimony was reliable—at the time of trial he was a Cook County circuit

court judge; and  (ii) Degorski was prejudiced when the jury viewed a video of the removal of

bodies from the walk-in freezer in the restaurant. See *id.* ¶ 48. This court affirmed, finding the

prejudicial effect of the witness's status as a judge did not outweigh its probative value, and any

abuse of discretion was harmless. *Id.* ¶ 65. Nor did the trial court abuse its discretion in admitting

the video because its probative value outweighed any prejudice. Even if the video had been

erroneously admitted, that error would be harmless beyond a reasonable doubt. *Id*. ¶¶ 102-103. We

noted that "[e]ven though no physical evidence connected Degorski to the murders, both DNA and

fingerprint evidence inculpated Luna, [who was] Degorski's best friend with whom Degorski was

seen almost immediately after the offense." *Id.* ¶ 103. In addition to his relationship with Luna,

Degorski's conviction rested on his statements to McHale, King, Lockett, and Bakalla. *Id.*

¶ 25                                *Postconviction Petition*

¶ 26    Degorski, through counsel, filed a postconviction petition and, after amending it twice,

raised two sets of claims. First, he alleged the State improperly withheld material evidence in

violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Degorski claimed the State failed to disclose

that Lockett "was promised and received $100,000 in reward money in exchange for her testimony

against Degorski." His petition alleged the Village of Palatine established a reward fund shortly

after the murders, publicized on a local billboard. Several articles in local publications, including

the *Daily Herald* and the *Chicago Tribune*, discussed the reward money and had speculated that

Lockett may have been considered as a recipient. Indeed, the petition alleges that police "Sergeant Kozial assured Lockett that if she testified well and her testimony produced a conviction, she would receive the money." Degorski attached an affidavit from Richard James Bilik, an old romantic partner of Lockett's, attesting that "it seemed like [Lockett] was very interested in collecting on the substantial reward money and was willing to implicate anyone."

¶ 27 A resolution from the Village of Palatine and an accompanying monetary statement, also attached to the petition, showed that Lockett eventually received $49,064.50 for "provid[ing] information that directly led to the conviction of *** James Degorski."

¶ 28 Degorski further alleged that his counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for several reasons: (i) failing to investigate and present evidence of Lockett's monetary incentive to testify, (ii) failing to impeach Lockett on other matters affecting her credibility, (iii) failing to present evidence supporting Degorski's pretrial motion to suppress evidence, (iv) failing to object to, and later challenge on appeal, DNA evidence showing Luna's DNA on a chicken bone found at the scene, and (v) improperly preventing Degorski from exercising his right to testify at trial.

¶ 29 The State moved to dismiss Degorski's petition. As to the *Brady* claim, the State denied the existence of monetary promises made to Lockett in exchange for her testimony, emphasizing that any award came from the Village of Palatine and was contingent on a successful trial. The State also focused on the trial evidence. It argued, even if it had failed to tender information about Lockett's monetary motive to testify, that information would not have changed the outcome of the trial. Turning to Degorski's claims of ineffective assistance of counsel, the State largely did not dispute their factual basis. Instead, the State chalked each of his claims up to an unassailable

trial strategy. It repeated its argument that the outcome of trial would not have been different even if counsel had performed in the ways Degorski argued they should have.

¶ 30    The trial court dismissed Degorski's petition without an evidentiary hearing, finding "there is no *Brady* violation. I also find that there was no ineffective assistance of counsel and my final finding is that there is no substantial showing of a violation of constitutional right to demand relief under the Postconviction Act."

¶ 31                                    Analysis

¶ 32    In this court, Degorski raises the same claims arguing each should have advanced to a third stage evidentiary hearing; the State echoes the same rejoinders it made in the trial court. Although we are persuaded by the State's analysis, both parties at oral argument took positions requiring us to clarify the standard we use to evaluate second-stage dismissals of postconviction petitions.

¶ 33    The Postconviction Hearing Act requires a third-stage evidentiary hearing "whenever the petitioner makes a substantial showing of a constitutional violation." *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). When determining whether a petition should advance to the third stage, the trial court makes no factual findings and considers all well-pled factual allegations true. *Id.* at 380-81. At this stage, we still construe all claims liberally in Degorski's favor. *Id.* at 382. Here we offer our first clarification. At oral argument, Degorski's counsel urged us to find that our obligation to take the claims in his petition as true alleviated his burden to provide evidence supporting those claims, including his own affidavit. Though our second-stage review is deferential to the pleadings, Degorski asks us to go further than Illinois Supreme Court precedent allows.

¶ 34    Starting in *People v. Collins*, 202 Ill. 2d 59, (2002), the supreme court distinguished between verification affidavits required by section 122-1 of the Act and evidentiary affidavits

required by section 122-2 of the Act. *Id.* at 66-67. The former serves only to attest that the pleading is made in good faith; the latter, on the other hand, provides evidence that the allegations in the petition are capable of independent corroboration. *Id.* at 67. Even at the first stage, failure to attach evidentiary affidavits dooms a postconviction petition. *Id.* at 69. The supreme court has softened the harsh edges of its decision in *Collins*, but never in a way that excuses a postconviction petitioner from providing his or her *own* evidentiary affidavit. *E.g., People v. Hall*, 217 Ill. 2d 324, 333 (2005) (where defendant provided his own affidavit, and only other affidavit that could support his claim was trial counsel's, failure to attach additional affidavit would be excused for ineffective assistance claim); *People v. Delton*, 227 Ill. 2d 247, 258 (2008) (chastising defendant for failing to attach evidentiary affidavit where contents would have been within defendant's knowledge); *People v. Allen*, 2015 IL 113135, ¶ 34 (forgiving failure to notarize evidentiary affidavit where attached evidence in form of affidavit was "capable of independent corroboration"). Our appellate court has similarly forgiven the failure to attach affidavits where the underlying record supports the petitioner's claims. *E.g,. People v. Hanks*, 335 Ill. App. 3d 894, 898-99 (2002).

¶ 35    We recognize a tension between a requirement that a petitioner supply, at minimum, his or her own evidentiary affidavit with the supreme court's repeated admonishments that we take the allegations in the petition as true at the first and second stages. *E.g., People v. Sanders*, 2016 IL 118123, ¶ 31. But the legal inquiry on review from second stage dismissals always includes our "assessment of the allegations of the petition *and* supporting documentation," if there is any. See *id.* (Emphasis added). To the extent tension remains, the supreme court must resolve it. Without more explicit guidance, we see no basis on which to excuse Degorski, who was represented by

counsel at the second stage, from including his evidentiary affidavit addressing the claims for which his testimony would be relevant.

¶ 36    We would be remiss if we did not address one of the State's pervasive misstatements of our second-stage review standards. The state repeatedly—at oral argument in particular—argued that many of Degorski's claims were "positively rebutted by the record" simply because they are based on factual allegations inconsistent with testimony or other evidence in the original trial record. In *People v. Robinson*, 2020 IL 123849, the supreme court clarified that new evidence is only positively rebutted by the record where "no factfinder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* ¶ 60. The court in *Sanders* offered a concrete example: a witness's recantation testimony explaining the witness shot a murder victim once is irreconcilable with forensic testimony that the victim was shot twice. *Sanders*, 2016 IL 118123, ¶ 48. Though *Sanders* and *Robinson* arose in a different procedural posture, we see no reason their definition of "positively rebutted by the record" fails to apply here. Were it any other way, no postconviction claim would ever succeed because, by definition, such claims are inconsistent with the trial record.

¶ 37    With these clarifications we proceed to the merits, reviewing the trial court's second-stage dismissal of Degorski's postconviction petition *de novo*. *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 25.

¶ 38                    Brady *Violation & Related Ineffective Assistance Claim*

¶ 39    Degorski first argues that the State violated its obligation to disclose favorable evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding "Lockett's financial incentive to testify against [him]." He argues Lockett "expected to receive" the reward money set aside by the

Village of Palatine. The State responds that it did not withhold any evidence of Lockett's motive to testify because no monetary "promise" ever existed. And, says the State, even if someone had promised Lockett the reward money in exchange for her testimony, the evidence was "overwhelming" such that her motive was not material evidence. Though we agree Degorski made a substantial showing that the evidence of Lockett's monetary motive to testify was favorable impeachment evidence that the State failed to disclose, it was not material to his guilt. For similar reasons, he suffered no prejudice from his counsel's failure to discover Lockett's monetary motive and cross-examine her about it. Degorski's *Brady* claim and related ineffective assistance of counsel claim fail.

¶ 40   Under *Brady*, prosecutors must disclose all evidence favorable to the accused. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). The prosecutor's obligation extends to "evidence known to police investigators" or "other government actors." *Id.* To succeed on a *Brady* claim, a defendant must show three things: (i) the undisclosed evidence is favorable to the accused as either exculpatory or impeaching, (ii) the State withheld the evidence from the accused, either intentionally or inadvertently, and (iii) the evidence was material to the accused's guilt or punishment. *Id.*, at 73-74. The State, in some fashion, challenges all three elements of Degorski's *Brady* claim.

¶ 41   First, the State argues that any monetary benefit Lockett may have received was not "undisclosed." The State points to the exhibits attached to Degorski's petition showing news articles about the award and speculation that Lockett might receive it as evidence that any information about the award was public at the time of trial. The State then argues there was no

evidence of any "promise" to Lockett, meaning nothing left for the State to disclose. We find this part of the State's argument foreclosed by Degorski's pleadings.

¶ 42    Degorski's petition alleges that Sergeant Kozial of the Palatine Police Department, "assured Lockett that if she testified well and her testimony produced a conviction, she would receive the money." Though we have no affidavits from any of the officers, James Bilik's affidavit explains that Lockett knew that "whoever came forward with information [about the Brown's Chicken murders] would be entitled to reward money." He also averred that "it seemed like Anne [Lockett] was very interested in collecting on the substantial reward money." At this stage, we take these allegations as true and construe them liberally. *Coleman*, 183 Ill. 2d at 380-82. Degorski's allegation that Sergeant Kozial promised Lockett the reward money is supported by Bilik's affidavit explaining that Lockett expected to receive the reward money and was "willing to implicate anyone."

¶ 43    The State offers two counters to this conclusion: (i) the State's relationship with the trustees of the Palatine reward fund was too tenuous to impute the knowledge of any promise to the State, and (ii) Lockett's ultimate receipt of the reward was too tenuous at the time any alleged promise was made to support *Brady* relief. We find neither argument persuasive.

¶ 44    We agree with the State, as a general matter, that the connection between the agency possessing the allegedly exculpatory or impeaching information and the State's Attorney's Office must be sufficiently concrete to impute knowledge to the State. See, *e.g,. In re C.J.*, 166 Ill. 2d 264, 269-70 (finding relationship between State's Attorney's Office and Department of Children and Family Services investigators insufficient to attribute to State knowledge gained by DCFS). But based on the allegations in Degorski's petition, the relevant entity that promised the reward

was the Palatine Police Department (through Sergeant Kozial), not the trustees of the reward fund. Moreover, as a matter of law, prosecutors are generally expected to know when the police involved in their case know of exculpatory evidence. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"). The State does not challenge its connection to the Palatine Police Department for *Brady* purposes and we find the connection sufficient at least at this stage of postconviction proceedings.

¶ 45    We also find the State's concern about the remoteness of the connection between the alleged promise and the eventual payoff does not apply here. For *Brady* purposes, a promise that creates an "expectation[ ] of special favor *** in the mind of the witness" is enough to trigger disclosure obligations. *People v. Morales*, 2019 IL App (1st) 160225, ¶ 32 (quoting *People v. Triplett*, 108 Ill. 2d 463, 467 (1985)). Indeed, the conditional nature of the promise may only increase a witness's incentive to testify falsely. *Id.*, ¶ 27 (citing *United States v. Bagley*, 473 U.S. 667, 663 (1985)). The resolution creating the reward fund expressly conditions the reward on the Village of Palatine's satisfaction with the outcome of trial—the fund would only compensate a person who "provide[d] information that directly l[ed] to the arrest and conviction of the person or persons responsible for the murders." The existence of the promise made by Sergeant Kozial, its contingent nature created by the Village of Palatine, and Lockett's expectation that she would receive the award if she implicated someone constitutes impeaching testimony that the State did not disclose.

¶ 46    We turn, then, to the State's primary argument: even if it failed to disclose impeaching evidence, Lockett's monetary motive to testify against Degorski was not material to his conviction.

Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. Harris*, 206 Ill. 2d 293, 312 (2002). We ask not whether the remaining evidence was sufficient but whether the new favorable evidence could "put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Evidence can be material even if only used for impeachment. *Id.*

¶ 47     We find the evidence of Lockett's monetary motive to testify would not have been material to Degorski's guilt or innocence. Even if impeaching Lockett would have caused the fact finder to discount her testimony entirely, Degorski confessed to three other witnesses: Eileen Bakalla, Officer King, and Assistant State's Attorney McHale. As we recounted in the direct appeal order, the confessions were largely consistent and provided detail beyond media coverage of the murders. See *Degorski*, 2013 IL App (1st) 100580, ¶¶ 10-11, 20-29. Degorski has not identified, and we cannot think of, a reason the damage to Lockett's credibility caused by her monetary motive to testify would impact the credibility of the remaining confessions. Our confidence in Lockett's testimony is shaken, but not our confidence in the verdict.

¶ 48     We reject Degorski's related claim of ineffective assistance of trial counsel for similar reasons. He argues counsel was ineffective for failing to impeach her, assuming counsel knew of Lockett's monetary interest in Degorski's conviction. To prevail on a claim of ineffective assistance, the defendant must meet the familiar *Strickland* standard by showing that (i) his or her counsel's performance was deficient, and (ii) counsel's deficient performance prejudiced him or her. *Strickland v. Washington*, 466 U.S. 668, 687, 697 (1984). Failure to satisfy either prong dooms a claim. *People v. Garcia*, 405 Ill. App. 3d 608, 620 (2010). We review claims of ineffective assistance of counsel *de novo*. *People v. Utley*, 2019 IL App (1st) 152112, ¶ 37.

¶ 49   Degorski has failed to make a substantial showing of *Strickland* prejudice. To show prejudice, there must be a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45. The only question is whether a not guilty verdict would have been reasonable, so counsel may be ineffective even if the chance of acquittal is "significantly less than 50 percent." *Id*. Even under that relatively low standard, Degorski's claim fails. Even if his counsel had significantly impeached Lockett and Bakalla to the point where a factfinder disregarded their testimony completely, Degorski confessed to police and prosecutors in multiple consistent statements relaying specific details of the crime. Degorski's allegations do not "undermine confidence in the outcome" of his trial, and, as a result, counsel was not ineffective for the alleged failure to investigate Lockett's monetary motive and cross-examine her about it at trial.

¶ 50                    *Other Ineffective Assistance of Trial Counsel Claims*

¶ 51   Degorski asserts ineffectiveness of trial counsel on several bases in addition to the *Brady* claim. Degorski argues he made a substantial showing of ineffective assistance of trial counsel based on trial counsel's failure to (i) to investigate and present evidence, unrelated to monetary motive, that would have undermined Lockett's credibility, (ii) to present evidence at the pretrial hearings on the motion to suppress statements showing officers arrested him without probable cause in Indiana, (iii) to present evidence at the hearing on the motion to suppress statements showing his confession was involuntary and coerced; (iv) to acquiesce in his testifying in his own behalf; and (v) to move to bar DNA evidence and appellate counsel's failure to raise the issue on direct appeal.

¶ 52    Again, to warrant third stage postconviction proceedings on a claim of ineffective assistance of counsel, Degorski must make a substantial showing that (i) his counsel's performance was deficient, and (ii) counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. 668 at 687, 697. As we said before, failure to satisfy either prong dooms a claim. *Garcia*, 405 Ill. App. 3d at 620.

¶ 53                                      *Lockett's Credibility*

¶ 54    In addition to the ineffective assistance claim in relation to his *Brady* claim, Degorski asserts five reasons to conclude counsel was ineffective for failing to present evidence related to Lockett's credibility: (i) readily available evidence that Lockett could not receive phone calls at the hospital shows that Lockett's testimony that Degorski called her a few days after the murders was untrue; (ii) counsel failed to present testimony from Richard Bilik, Lockett's boyfriend at the time of the murders; (iii) had counsel conducted a reasonable investigation he would have learned that Lockett was "actively trying to pin the Brown's Chicken murders on someone so that she could claim the $100,000 reward established by the Village of Palatine"; (iv) counsel failed to present testimony from Degorski's mother Pat, who would have refuted "several" of Lockett's claims—*i.e.*, the basement bedroom Lockett described as the location where Degorski confessed to her in 1993 did not even exist in 1993 and Lockett's claim she was afraid of Degorski was false; (v) counsel failed to apprise the jury through cross-examination or third-party witness testimony that Lockett had a long a documented history of being dishonest.

¶ 55    We resolve these claims as we did Degorski's other ineffectiveness claim related to counsel's treatment of *Brady* evidence impeaching Lockett. Even assuming the evidence Degorski puts forward would have destroyed Lockett's credibility entirely, he confessed to several other

people with detailed narratives of the crime; there is no reasonable probability the outcome of trial would have been different had counsel put this evidence before the jury. *Supra*, ¶ 51 (citing *Lucious*, 2016 IL App (1st) 141127, ¶ 45 (reciting standard for *Strickland* prejudice)).

¶ 56                                *Evidence of Degorski's Unlawful Arrest*

¶ 57     Degorski argues trial counsel was ineffective for "fail[ing] to support Degorski's motion to suppress statements and quash arrest with available evidence he was illegally arrested in Indiana." Much of Degorski's argument attempts to relitigate the motion to suppress with evidence already in the record. For example, he argues that the officer's testimony is implausible, describing various portions of the hearing testimony as "patently incredible" or "bordering on absurd." But postconviction proceedings are not the place to relitigate issues that could have been or were raised on direct appeal. *E.g., People v. Allen*, 2015 IL 113135, ¶ 20. Degorski has litigated or has had the opportunity to litigate the credibility of the officers' suppression hearing testimony. We will not reweigh it now.

¶ 58     We will, instead, focus on the new evidence Degorski offers. In his postconviction petition, Degorski referred to his own testimony he could have offered to show that officers "refused to let him leave *** ordered him into a police vehicle and denied him the opportunity to grab any of his personal belongings," and that he did not subjectively believe he was free to leave. The petition then refers to another witness, Walter Hanger, who "saw Degorski searched and placed in a police car." The petition also mentions possible testimony from the Hamilton County Sheriff "that Palatine police told them that they were conducting an 'arrest' of Degorski." The last piece of evidence discussed in the petition is a "Call for Service sheet that clearly indicated that Hamilton County was informed that Palatine was issuing an 'arrest warrant' for Degorski."

¶ 59     This evidence does not substantial show ineffective assistance of counsel for several reasons. First, Degorski's appellate counsel has abandoned reliance on all of the evidence referenced in the petition, except for the "Call for Service sheet." *E.g. People v. Lewis*, 2017 IL App (1st) 150070, ¶ 9 (counsel abandons postconviction claims where claims are raised in petition but not reasserted on appeal). Second, even if most of the evidence were not abandoned on appeal, it is not adequately presented in the petition. For example, Degorski did not attach his own affidavit explaining what his testimony would have been at the motion to suppress. Similarly, there are no affidavits from Hanger or the Hamilton County Sheriff contradicting the testimony in the record. *Cf. People v. Coleman*, 2014 IL App (4th) 110463, ¶ 64 (affidavits not necessary only where petition is otherwise supported by record), *superseded on other grounds as stated in People v. Robinson*, 2020 IL 123849, ¶ 78 (Illinois Supreme Court Rule 1101 allows hearsay evidence in postconviction proceedings)).

¶ 60     Additionally, we cannot locate the "Call for Service sheet" in the record. The only pages appellate counsel cites in her brief referencing the exhibit purportedly containing the "Call for Service" are the pages in the petition where the sheet is mentioned. A word search of the common law record for "Exhibit G," which contains the "Call for Service sheet," reveals only a complaint for a search warrant of a residence and an excerpt of trial testimony.

¶ 61     Even if we could locate the "Call for Service sheet" and it contained the information counsel describes, it would not help Degorski's ineffective assistance claim. Degorski argues the "call sheet" would show "Palatine police's intent to *arrest*, not simply chat, with Degorski." (Emphasis in original). But the subjective beliefs of the officer (or Degorski for that matter) are not relevant to whether officers have seized a person in a constitutionally meaningful way. *E.g.,*

*In re Tyreke H.*, 2017 IL App (1st) 170406, ¶ 54 ("the officer's subjective motivation, and his or her reason for stopping a citizen *** are irrelevant to the question of whether a seizure occurred."). Because the evidence Degorski argues should have been presented would have been irrelevant to whether he was arrested in Indiana, he cannot show prejudice from counsel's failure to introduce that evidence at the hearing on the motion to suppress. See *People v. Henderson*, 2013 IL 114040, ¶ 15 (to show prejudice for errors in motion practice, defendant must show that "suppression motion is meritorious").

¶ 62                          *Evidence that Officers Coerced Degorski's Statement*

¶ 63     Degorski next argues trial counsel was ineffective for failing to "call available witnesses to substantiate his claim that his oral, unrecorded confession was the product of police coercion." He points to two witnesses: (i) himself, and (ii) Jonathon Simonek, who allegedly experienced similar coercive interrogation tactics at the hands of police. We find Degorski failed to make a substantial showing of a constitutional violation because his claim about his own testimony is not supported by an affidavit and his claim about Simonek's testimony is both unsupported by an affidavit and irrelevant to the issue at the hearing on the motion to suppress.

¶ 64     A postconviction petitioner is not relieved of the burden of attaching affidavits or other supporting documentation to their petition simply by including a verification affidavit at the end of the petition. *Collins*, 202 Ill. 2d 49, 67-68 (2002). We can overlook certain deficiencies in affidavits or the failure to attach evidence in certain circumstances. See *Allen*, 2015 113135, ¶ 34 (excusing failure to notarize affidavit at first stage); *Collins*, 202 Ill. 2d at 67-68 (discussing *People v. Washington*, 38 Ill. 2d 445 (1967) (excusing failure to attach affidavit where absence explained), and *People v. Williams*, 47 Ill. 2d 1 (1970) (excusing failure to attach affidavit where only evidence

other than petitioner's own affidavit was that of counsel)). We see no basis on which to excuse Degorski from providing his own affidavit, which would contain allegations within his knowledge; this is especially true where counsel represented him at the second stage who could have drafted the affidavit for him.

¶ 65     Degorski suggests his mother's affidavit can substitute for his own. We disagree. In his brief, Degorski says his mother's affidavit attests that he "wanted to testify" about the coercive environment he experienced during his interrogation. We do not read the affidavit that broadly. The affidavit explains that Degorski told his counsel "over and over that he wanted to testify," but counsel would not allow it and tried to get Degorski's mother to convince him not to testify. But the remaining substance of the affidavit has nothing to do with the suppression hearing and refers to information from Lockett's testimony that Degorski's mother believed to be untrue. The affidavit makes no mention of coercive interrogation tactics or Degorski's desire to testify about such tactics. In short, no evidence supports the allegations in the petition that officers coerced Degorski's confession.

¶ 66                    *Claim that Defense Counsel Prevented Degorski's Testimony*

¶ 67     Degorski then claims his trial counsel was ineffective because he "prevented" Degorski from testifying on his own behalf. The affidavit of Degorski's mother attests that Degorski wanted to testify in his defense and that trial counsel would not let Degorski testify and enlisted his mother to help persuade him not to testify. Degorski's petition asserted that had Degorski testified, he would have (i) discredited Lockett's testimony that he confessed to her, (ii) testified that Bakalla's testimony was a lie, and (iii) testified that the police coerced a false confession from him. He reasons that the jury would have been presented with conflicting evidence and concludes there was

'a reasonable probability that the outcome would have been different if the jury had heard Degorski's testimony undermining the State's evidence."

¶ 68    Degorski's argument suffers from the same evidentiary deficiencies as many of his previous arguments: we cannot evaluate prejudice because he did not execute his own affidavit explaining what his trial testimony would have been had counsel called him to testify. His petition sets out some detail relating to his proposed testimony about his treatment at the hands of Palatine police. But as to his challenges to Lockett's and Bakalla's testimony, the petition is conclusory. For example, he says that he would testify that "Lockett's testimony claiming that he confessed to her [was] patently false" or that "Bakalla's testimony was equally false." Without elaboration in an affidavit, we cannot say Degorski made a substantial showing of prejudice from counsel's alleged interference with his right to testify.

¶ 69    An affidavit containing specific information would also be helpful in another regard: explaining why we should not credit Degorski's decision to waive, on the record, his right to testify. Generally, on-record admonishments about the right to testify rebut any claim that trial counsel was ineffective for preventing a defendant from testifying—even when considering an ineffectiveness claim through the lenient lens of first-stage proceedings. *People v. Knapp*, 2020 IL 124992, ¶¶ 52-54. Our supreme court appears to have left open the possibility of an exception where "defense counsel has just silenced the defendant." *Id.*, ¶¶ 55-57 (discussing *Hartsfield v. Dorethy*, 949 F.3d 307, 315 n.5 (7th Cir. 2020)). We acknowledge Degorski's petition alleges that "trial counsel was adamant that Mr. Degorski was not going to testify on his own behalf and communicated that sentiment to Mr. Degorski." Without an affidavit, however, we do not know the timing of those conversations or the details of those conversations.

¶ 70    It would be easy to forgive these omissions on first-stage review, where Degorski's claims need only have been arguable. At this stage, however, Degorski was assisted by counsel and must make a *substantial* showing of a constitutional violation. Even taking his allegations as true, there simply is not enough detail in the petition itself to make the required showing without additional information in an affidavit.

¶ 71            *Trial Counsel and Appellate Counsel Failed to Challenge DNA Evidence*

¶ 72    Degorski next argues trial counsel was ineffective for failing to move to exclude DNA evidence found on a chicken bone showing Luna was present at the time of the murders; he adds that appellate counsel was also ineffective for failing to raise the issue on direct appeal. He argues that Luna's DNA at the scene was irrelevant to his guilt or innocence and points to only one indicium of prejudice: "juries and courts alike find DNA evidence highly persuasive." We agree and have said so. *E.g., People v. Wright*, 2012 IL App (1st) 073106, ¶ 96 (describing "DNA match" as "highly persuasive" evidence). Degorski never draws the link between the persuasive nature of the evidence of Luna's presence at the scene of the murders and his own guilt. He, therefore, cannot show prejudice from trial counsel's failure to challenge the DNA evidence or appellate counsel's failure to raise the issue in his direct appeal.

¶ 73    We need not restate the standard governing ineffective assistance of counsel claims other than to add that ineffective assistance of appellate counsel claims are (i) governed by the same standard, and (ii) rise or fall on the merits of the underlying claim. See *e.g., People v. English*, 2013 IL 112890, ¶¶ 33-35. As with Degorski's previous claims, this turns on assessing prejudice from counsels' alleged errors.

¶ 74    In Degorski's petition, he claims to admit Luna's DNA evidence in his trial prejudiced him because "[t]here can be no bout that the jury improperly used that testimony to conclude that Luna

was guilty of the crime and that if Luna was guilty, Degorski must be guilty." The petition further reasons that the State's case hinged almost entirely on Luna's and Degorski's statements to Lockett and Bakalla, and so the DNA evidence bolstered their testimony as well.

¶ 75 Degorski's appellate counsel does not adopt these arguments in her brief, focusing exclusively on the prejudicial nature of DNA evidence more generally. As mentioned, we agree with that general proposition. We have cited studies describing the "mystical aura" surrounding DNA evidence to the point that "its mere introduction in a criminal case is sufficient to seriously impede defense challenges." *Wright*, 2012 IL App (1st) 073106, ¶ 96 (citing Joel D. Lieberman *et al.*, *Gold versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Evidence?*, 14 Psychol. Pub. Pol'y & L. 27, 33, 58 (2008)). But every case Degorski cites involves the prejudicial impact of DNA evidence directly implicating the defendant in the crime. *In re T.W.*, 402 Ill. App. 3d 981, 993 (2010); see also *People v. Safford*, 392 Ill. App. 3d 212, 216, 225-26 (making same point about fingerprint evidence showing defendant's presence at scene). Degorski does not explain how DNA evidence showing Luna was present at the time of the murders—powerful evidence though it may be—is prejudicial as to him. We find it particularly difficult to discern the prejudicial impact of the DNA evidence because, in Degorski's own words, "it was not contested that Luna was present at the scene."

¶ 76 Degorski cannot establish prejudice from trial counsel's failure to move to exclude Luna's DNA evidence. On appeal, he fails to draw any connection between the DNA evidence and his own guilt, and, even if he had, the evidence was cumulative of other trial evidence by his own admission. For the same reasons, we conclude that the outcome of Degorski's direct appeal would not have been different had appellate counsel raised the issue, and so he suffered no prejudice from appellate counsel's alleged deficiency either.

¶ 77    Our decision to affirm rests mainly on the heightened burden placed on Degorski at the second stage of postconviction proceedings. Though we construe the allegations in the petition liberally at this stage, to make a substantial showing of a constitutional violation, "the allegations in the petition must be supported by the record in the case *or by its accompanying affidavits*." *Coleman*, 183 Ill. 2d at 381. The only basis for excusing the affidavit requirement, especially at the second stage, is where "the allegations in the petition are based upon matters of record." *Id.* Each of Degorski's claims requires us to consider matters outside the record, and without factual details we cannot glean from the pleadings themselves, we cannot say Degorski made a substantial showing of a constitutional violation sufficient to warrant further proceedings under the Act.

¶ 78    Affirmed.